[Crim. No. 4146. Fourth Dist., Div. Two. Jan. 14, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
DENNIS HARVEY MALTZ, Defendant and Respondent.

## COUNSEL

Cecil Hicks, District Attorney, Michael R. Capizzi and Oretta D. Sears, Deputy District Attorneys, for Plaintiff and Appellant.

Frank L. Williams, Jr., Public Defender, and James R. Goff, Deputy Public Defender, for Defendant and Respondent.

## OPINION

**KAUFMAN, J.**—By a complaint filed in the Municipal Court of the South Orange County Judicial District, defendant was accused of possession of restricted dangerous drugs—LSD (count I, Health & Saf. Code, § 11910) and furnishing and sale of restricted dangerous drugs—LSD (count II, Health & Saf. Code, § 11912). After a preliminary hearing, defendant was held to answer, and an information, consisting of two counts, was filed in the Orange County Superior Court charging defendant with these offenses. Defendant's motion to set aside the information made pursuant to Penal Code section 995 was granted by the superior court. The People appeal from the order. (Pen. Code, § 1238, subd. (1).)

Aside from the observations of two police officers, the incriminating evidence consisted of pills containing LSD seized by the officers in a search of the person of one William Monroe and similar pills seized by the officers from a certain residential garage. At the preliminary hearing, the municipal court found the search of and seizure of contraband from William Monroe and the seizure of contraband from the residential garage lawful. The superior court found the search and both seizures unlawful.

## The Issues

For reversal, the district attorney contends:

(1) There was probable cause for the arrest and search of the person of William Monroe;

(2) Assuming that the search of Monroe was unlawful, nevertheless the evidence seized from his person was admissible in a criminal prosecution against defendant, inasmuch as defendant has no standing to attack the illegal search of another;

(3) There was no search of the residential garage and seizure of contraband therefrom was lawful;

(4) Even if the seizure from the garage was unlawful as to the owner or occupant of the property, the evidence is admissible as against defendant inasmuch as he neither owned, occupied or controlled the garage, that is, that defendant has no standing as to assert a seizure of contraband that may have been unlawful as to some third person.

We have concluded that the first and third contentions are meritorious. It will be unnecessary, therefore, for us to consider the interesting problems presented by the second and fourth contentions.

## The Facts

The events that form the basis of the criminal charges against the defendant transpired during the evening and night of July 26, 1969. On that evening, Sergeant Babcock and Detective Purcell of the Laguna Beach Police Department were participating in a surveillance of the parking lot area of Albertson's Market in Laguna Beach. The surveillance was conducted from a vantage point across the street from the parking lot. Officer Purcell was using binoculars. Sergeant Babcock was not.

The officers were working together and observed substantially the same events. It would serve no useful purpose, therefore, to segregate their testimony, and, except as specifically indicated by reference to the officers' names, no such segregation is hereinafter made.

Both officers were thoroughly experienced in police work relating to narcotics and dangerous drugs. Both had also had a great deal of experience with drug traffic in the immediate area of the incidents here involved. Between them they had made approximately 100 arrests for drug and narcotic offenses in the immediate area. Many of the cases were still pending, but about 15 had resulted in convictions, and, in many of those still pending, the defendants had been held to answer after preliminary hearing. In almost all of these cases, the officers had observed conduct very similar to the conduct observed in the case at bench. The officers had also observed that the greatest incidence of narcotic traffic in the area occurred between the hours of 7 and 10 p.m.

The officers first saw defendant in the area of the parking lot at approximately 7:50 p.m. Defendant walked toward a man in a green vest and levi pants and stopped in front of him. The man handed currency to defendant as defendant extended his right hand toward the man. Each then walked off in a different direction.

Approximately 40 minutes later defendant was again seen walking in the same general area. This time he approached a man later identified as William Monroe. As defendant went up to Monroe, Monroe extended his left hand toward defendant with the palm turned up. Defendant extended his left hand toward Monroe with the palm turned down. As Monroe withdrew his left hand, he placed it in his lefthand pants pocket. Both Monroe and defendant walked away together. Monroe appeared extremely nervous.

In defendant's comings and goings he was twice observed in the vicinity of, and once on the yard of, a house at 684½ Glenneyre Street on the corner of Glenneyre and Cleo Streets, a short distance from the parking lot. Sergeant Babcock testified that his experience with narcotic and drug traffic in the area demonstrated that the seller will frequently have a "stash" [supply of drugs] somewhere near the area and that he will return to the point of the "stash" from time to time as the need arises to obtain an additional supply for sale.

Based upon the foregoing observations of defendant's conduct and their knowledge and experience,[1] the officers decided to stop defendant and

---

[1]Defendant asserts in his brief that "Officer Pursell [*sic*] testified it was quite common to see panhandling and exchanges of food and goods among the youth in the area." We have not included this assertion in the statement of facts, inasmuch as we do not think it an accurate statement of the testimony. The officer was asked whether he had observed the so-called hippie types that frequent the beach area during the summer and whether he had ever noticed them giving money to one another. He answered "Yes," to both questions and added "I have seen panhandling where there is an exchange of money." There is no evidence however that defendant and Monroe were "hippie types" or that the officer's testimony as to "panhandling" related to the particular area where defendant engaged in the transactions here in question.

Monroe and confronted them in the driveway of the market. The officers stated that they were conducting a narcotics investigation involving the two men and advised them of the officers' observations of their conduct. Both men were then advised of their *Miranda* rights. The officers then asked each man for permission to search his person for narcotics. Defendant gave permission. He was searched and no narcotics or drugs were found on him. Monroe, on the other hand, refused to give permission. When asked whether he had any "dope" on him, Monroe stated, "No." Officer Purcell then told Monroe that he intended to search him notwithstanding his objection, and, upon so doing, found four white-colored, odorless, double-domed pills in his lefthand pants pocket. These pills contained a usable quantity of LSD. Both men were then arrested: Monroe for possession of dangerous drugs and Maltz for selling or furnishing dangerous drugs.

After the two men had been taken to the police station for booking, Sergeant Babcock, based upon his knowledge that drug dealers frequently have a "stash" and upon his observation of defendant in the vicinity of and in the yard of the house on the corner of Glenneyre and Cleo Streets, returned to that location to make an investigation of the area from which he had seen defendant come.

The exact location of the structures, doors, areas and objects next referred to and the location of Detective Babcock in relation thereto cannot be accurately ascertained from the record. Most of the testimony was given by Officer Babcock with reference to a diagram of the location drawn by him at the preliminary hearing. So far as the record discloses, the diagram itself was not introduced into evidence and was not before the superior court. It should also be noted that, at the request of counsel for defendant, the magistrate who conducted the preliminary hearing viewed the premises. The record before us, and presumably that before the superior court, does not disclose what facts were observed during this view of the premises.

From the reporter's transcript of the preliminary hearing, the following facts appear. The garage was situated about one and one-half "car widths" from what would be the curb of Cleo Street if Cleo Street had a curb. There is a driveway to the garage and a vehicle door in the garage. Somewhere in the vicinity of the driveway, apparently on the presumably private property itself, there were a number of garbage cans and trash and papers on the ground. Sergeant Babcock was on his hands and knees around the

In our review, we are required to view the evidence most favorably to the determination of the magistrate. (*Perry* v. *Superior Court,* 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; *People* v. *Martinez,* 3 Cal.App.3d 886, 889 [83 Cal.Rptr. 914]; *People* v. *Shapiro,* 213 Cal.App.2d 618, 620 [28 Cal.Rptr. 907]; *People* v. *Fisher,* 184 Cal. App.2d 308, 312 [7 Cal.Rptr. 461].)

garbage cans picking up papers and looking under them. He noticed the bottom board on the outer surface of the garage failed to meet the ground by about 6 inches. He shone his flashlight toward the garage and, in this space at the bottom of the garage to the left of the vehicle entrance, something bright in color caught his eye. From a distance of about 3 feet he observed a brown and yellow paper bag similar to that in which "Fritos" or corn chips are packaged, and on closer examination he could see that there was a hole in the bag and through the hole he could see a number of white, double-domed tablets identical in appearance to those found on Monroe. The bag of pills was apparently located inside the garage structure approximately 10 to 12 inches from the outer wall. Without otherwise entering the garage, Sergeant Babcock inserted his hand into the open space and seized the bag of pills. The pills were subsequently analyzed and found to contain a usable quantity of LSD.

The judge at the preliminary hearing was concerned about the ownership and control of the garage and asked that evidence be adduced with respect to these matters. Defendant's attorney declined to enter into a stipulation concerning them. The only evidence that the prosecution was able to adduce at the preliminary hearing was that at the time of their booking, defendant gave his address as Caldwell, New Jersey, and gave no local address and that Monroe gave the address 519 Via Flores, San Clemente. Officer Purcell also testified that he was on the phone when Sergeant Babcock had a telephone conversation with the owners of the property, the clear implication being that the owners were someone other than the defendant or Monroe. Although the magistrate felt that the evidence was inconclusive as to defendant's ownership or occupancy of the property, he nevertheless concluded that defendant could not have had a reasonable expectation of privacy in respect thereto. In his brief on appeal, defendant concedes that he "had no legitimate interest in the garage."

### Validity of the Search of William Monroe

At the outset, defendant argues that the prosecution did not urge at the time of the section 995 proceedings that the search of Monroe was lawful and that the People may not raise this issue for the first time on appeal. This argument is untenable. Although the People did not assert the validity of this search at the time of the 995 motion, they did assert its validity at the preliminary hearing. In determining defendant's motion under Penal Code section 995, the superior court was acting as a reviewing court, and, on this appeal, we likewise are reviewing the action of the magistrate in holding defendant to answer. (*People* v. *Heard,* 266 Cal.App.2d 747, 749-750 [72 Cal.Rptr. 374]; see also *People* v. *Superior Court,* 276 Cal.App.2d 581, 584-586 [81 Cal.Rptr. 42].) In so doing,

this court must accept all evidence, including all reasonable inferences therefrom, supportive of the magistrate's finding of reasonable cause. (*Perry* v. *Superior Court, supra,* 57 Cal.2d 276, 283; *People* v. *Martinez, supra,* 3 Cal.App.3d 886, 889; *People* v. *Shapiro, supra,* 213 Cal.App.2d 618, 620; *People* v. *Fisher, supra,* 184 Cal.App.2d 308, 312.)

█ A search of the person is, of course, permissible incident to a valid arrest (*Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034), and the question is whether, at the time Monroe was searched, the officers had reasonable cause to believe that he had committed a felony. (Pen. Code, § 836, subd. 3.) The fact that the search of Monroe's person preceded his arrest by moments would not vitiate the search if there was probable cause to arrest at the time the search was made. (*People* v. *Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Sirak,* 2 Cal.App.3d 608, 611 [82 Cal.Rptr. 716].)

█ The general principles are well settled. "There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations omitted]. . . ." (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." (*People* v. *Ingle, supra,* at pp. 412-413; *People* v. *Hillery,* 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208].) Good faith of the officer alone is not sufficient, but the evidence upon which the officer acts need not be sufficient to convict but only sufficient to incline the mind to believe, leaving some room for doubt. (*People* v. *Ingle, supra,* at p. 413.) █ The specialized knowledge of a police officer experienced in police narcotics work may render suspicious what would appear innocent to a layman. (*Cunha* v. *Superior Court,* 2 Cal.3d 352, 358 [85 Cal.Rptr. 160, 466 P.2d 704]; *People* v. *Berutko,* 71 Cal.2d 84, 90-91 [77 Cal.Rptr. 217, 453 P.2d 721]; *People* v. *Williams,* 196 Cal.App.2d 726, 728 [16 Cal.Rptr. 836].) Nevertheless, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the police instrusion. (*Terry* v. *Ohio,* 392 U.S. 1, 16-19, fns. 16, 20-21 [20 L.Ed.2d 889, 902-905, fns. 16, 20-21, 88 S.Ct. 1868]; *Cunha* v. *Superior Court, supra,* at p. 356.)

In support of his contention that the officers lacked reasonable cause, defendant relies upon *Cunha* v. *Superior Court, supra,* 2 Cal.3d 352 and *Remers* v. *Superior Court,* 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11]. The People rely upon the general principles stated above and *People* v. *Brown,* 147 Cal.App.2d 352 [305 P.2d 126]. █ Over and over again

the cases instruct that the question of reasonable cause is to be determined by reference to the particular facts and circumstances in the case at hand. (E.g., *Ker* v. *California*, 374 U.S. 23, 33 [10 L.Ed.2d 726, 738, 83 S.Ct. 1623, 1630]; *Go-Bart Importing Co.* v. *United States*, 282 U.S. 344, 357 [75 L.Ed. 374, 382, 51 S.Ct. 153, 158]; *People* v. *Terry*, 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Berutko*, *supra*, 71 Cal.2d 84, 93; *Bielicki* v. *Superior Court*, 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288]; *People* v. *Ingle*, *supra*, 53 Cal.2d at p. 412.) ▮ The suspicious facts and circumstances known to the officers in the case at bench were considerably greater and more suspicious than in *Cunha* or *Remers*, or even *Brown*, and were sufficient to support the magistrate's finding of probable cause.

In *Cunha*, the majority of the court characterized the situation as follows: "The instant arrest was predicated solely upon the officers' observations that petitioner and his companion looked around as they walked on a public sidewalk in broad daylight, and apparently engaged in some sort of transaction in an area known for frequent narcotics traffic. Neither petitioner's activities nor the location of his arrest provided probable cause for arrest." (*Cunha* v. *Superior Court*, *supra*, 2 Cal.3d at p. 357.)

Several important facts distinguish *Cunha* from the case at bench. In *Cunha*, the court minimized the officers' testimony concerning their knowledge of narcotics and drug activity in the area, noting that ". . . in the absence of any evidence in the record as to how many of those arrests [45 to 60 in 6 months] actually vindicated the officers' suspicions, it is impossible to determine how accurate their estimate of the local narcotics traffic was. In short, giving substantial weight to the perceived crime rate of an area may constitute a self-fulfilling prophecy." (*Cunha* v. *Superior Court*, *supra*, 2 Cal.3d at p. 357, fn. 1.) In the case at bench, there was specific testimony by Sergeant Babcock that of his approximately 50 arrests, approximately 15 cases had resulted in conviction to that time and that most of the others were still pending. Detective Purcell testified that most of the cases in which he had made an arrest were still pending but that a substantial number had resulted in the defendant being held to answer. In addition, in almost all of the cases in which the officers were previously involved, they had observed conduct very similar to the conduct observed in the case at bench and had observed that the greatest incidence of narcotics traffic in the area occurred between the hours of 7 and 10 p.m., the very time of the activities observed in the case at bench.

Perhaps even more importantly, the conduct observed by the officers in the case at bench was substantially greater, both in quantity and suspicious quality, than that involved in *Cunha*. In *Cunha* the officers observed the

defendant for a total of three to four minutes, during which time the defendant and his companion did nothing unusual except act in a nervous fashion. The officers observed one transaction involving an apparent exchange of something. In the case at bench, on the other hand, in addition to Monroe's nervous appearance, the officers observed defendant engage in two apparent exchanges in the same area within approximately 40 minutes and they observed him return several times to the vicinity of the yard of the property at the corner of Glenneyre and Cleo Streets. The suspicious quality of this observed conduct was materially enhanced by Sergeant Babcock's knowledge and experience that drug dealers frequently have a "stash" to which they return for an additional supply of drugs after having made a sale, as well as the officers' consistent observation of similar conduct in connection with the prior cases with which they were involved and which had resulted in a substantial number of successful prosecutions.

*Remers* is similarly distinguishable. In that case the officers observed the defendant woman talking with a "hippie-type" male; saw her look around over either shoulder and remove a tinfoil packet from her purse; saw her nod in a motion that they both go into a cafe. Although the officers claimed to have special knowledge concerning the area and previous drug dealings by defendant, the court found the former slight and disallowed the latter as unreliable. (*Remers* v. *Superior Court, supra,* 2 Cal.3d at pp. 666-667.) The court itself noted that "[t]he circumstances in the instant case provide less justification for arrest than did the circumstances held insufficient to validate the arrest in *Cunha.* The act of showing a tinfoil package to a companion is even less suspicious than that of engaging in a sidewalk sale. . . . Petitioner exhibited less concern with her surroundings than did the suspects in *Cunha.* . . ." (2 Cal.3d at p. 665.)

In *People* v. *Brown, supra,* it appears that the officers were patrolling a well-lighted alley at the rear of a hotel in Los Angeles at about 1:35 a.m. One of the officers testified that he knew that quite a bit of narcotics was sold in that area. The officers observed the woman defendant and another woman walk into the alley. They appeared to be conversing. "The defendant was observed placing something in the other woman's hand, when the officer heard what sounded like a coin hit the pavement. The defendant bent over, picked up the object, and placed it in the lady's hand. The other lady was observed removing something from her purse and placing it in the defendant's hand. The latter then placed her hand in the area of her breast." (147 Cal.App.2d at p. 354.) On these facts, the arrest was upheld, and a petition for hearing by the California Supreme Court was denied. (147 Cal.App.2d at p. 357.) *Cunha* did not disapprove *Brown,* but characterized the circumstances in *Brown* as more suspicious than those in *Cunha.* (*Cunha* v. *Superior Court, supra,* 2 Cal.3d at p. 358.)

There can be no question but that the facts and circumstances known to the officers in the case at bench were even more suspicious and of greater significance than those in *Brown*. In the case at bench the officers observed defendant involved in two apparent exchanges in the same area within 40 minutes. Their testimony as to their knowledge of drug and narcotics traffic in the area was far more complete and persuasive than in *Brown*. They had between them been involved in approximately 100 arrests in which they had almost invariably observed transactions substantially similar to those observed in the case at bench. They observed Monroe's nervous conduct. Moreover, with knowledge and experience that drug dealers often maintained a "stash" at a short distance from the place of sale, they observed defendant return several times to the vicinity of the property at the corner of Glenneyre and Cleo Streets. From the observations of the officers, based upon their special knowledge and experience, there was ample evidence to support the magistrate's finding of reasonable cause. The circumstances were such as to cause a man of ordinary care and prudence in the position of the officers to believe and conscientiously entertain an honest and strong suspicion that defendant was engaged in selling drugs and that he had made a sale to Monroe.

### Validity of the Seizure from the Garage

Having determined that the search of Monroe and the seizure of the contraband found on him were lawful, it is apparent that there was ample evidence to hold defendant to answer for the offense of sale of a restricted dangerous drug and that, therefore, the order of the superior court setting aside the information must be reversed. We nevertheless think it appropriate to determine whether the seizure of the contraband from the garage was valid. Defendant was charged in a separate count in the information with possession of restricted dangerous drugs, and it may well be that this count related to the contraband seized from the garage rather than that found on Monroe in which case defendant could possibly be convicted of (although not necessarily punished for) both possession and sale. (*People v. Sheldon*, 254 Cal.App.2d 174, 182 [61 Cal.Rptr. 778] and cases there cited.) Moreover, it would appear likely, in the event of trial, that the prosecution would attempt to introduce the evidence of the contraband found in the garage as circumstantial evidence on the count charging sale.

Inasmuch as the contraband in the garage was "in plain sight" there was no search of the garage in the constitutional sense. (*Ker v. California*, 374 U.S. 23, 43 [10 L.Ed.2d 726, 743, 83 S.Ct. 1623]; *People v. Marshall*, 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665]; *People v. Roberts*, 47 Cal.2d 374, 379 [303 P.2d 721]; *People v. Lees*, 257 Cal.App.2d 363, 368 [64 Cal.Rptr. 888].)

■ Although neither of the parties so characterizes it, we think that Sergeant Babcock's conduct in entering upon the driveway area and looking around on his hands and knees in the area of the garbage cans must be classified as a search. (Cf. *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602, 605; *People* v. *King,* 234 Cal.App.2d 423, 428 [44 Cal.Rptr. 500]; also cf. *People* v. *Bradley,* 1 Cal.3d 80 [81 Cal.Rptr. 457, 460 P.2d 129]; *People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713].)

■ It is necessary to determine whether that search was lawful, or to put it another way, whether Sergeant Babcock had a right to be where he was when he saw the contraband in the garage in plain sight. If not, his discovery of the contraband would have to be classified as "fruit" of an illegal search. (*Wong Sun* v. *United States,* 371 U.S. 471, 484 [9 L.Ed.2d 441, 453, 83 S.Ct. 407]; *People* v. *Edwards, supra,* at p. 1105; *People* v. *Bilderbach,* 62 Cal.2d 757, 766 [44 Cal.Rptr. 313, 401 P.2d 921].)

■ The analysis of the legality of a search on the grounds surrounding a private residence involving minor trespasses but not entry into a structure has been the subject of a considerable recent evolution. (See generally, *People* v. *Edwards, supra,* at pp. 1100-1104; *People* v. *Willard,* 238 Cal. App.2d 292, 298-307 [47 Cal.Rptr. 734].) Based upon the "open fields" doctrine of *Hester* v. *United States,* 265 U.S. 57, 58-59 [68 L.Ed. 898, 899-900, 44 S.Ct. 445], a number of cases indicated that the open areas surrounding a private residence and, indeed, some outbuildings, were not constitutionally protected areas. (E.g., *People* v. *Lees, supra,* 257 Cal. App.2d at p. 368; *People* v. *Shields,* 232 Cal.App.2d 716, 719 [43 Cal. Rptr. 188].) Other cases indicated that, although such areas might be constitutionally protected, a minor trespass made by a police officer in the course of his investigative duties did not necessarily constitute an unreasonable search. (*People* v. *King, supra,* 234 Cal.App.2d 423, 428-433; cf. *People* v. *Terry,* 70 Cal.2d 410, 427 [77 Cal.Rptr. 460, 454 P.2d 36]; *People* v. *Berutko, supra,* 71 Cal.2d 84, 90-92 and fn. 7; see also cases discussed in *People* v. *Willard, supra,* 238 Cal.App.2d at pp. 298-305.) In recognition of the proposition that the Fourth Amendment protects persons rather than places (*Katz* v. *United States,* 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507]; *People* v. *Edwards, supra,* 71 Cal.2d at p. 1103), and, perhaps, in recognition of the principle that the conflicting policy considerations involved in Fourth Amendment problems are not to be resolved by reference to technical rules of property (cf. *Jones* v. *United States,* 362 U.S. 257, 266 [4 L.Ed.2d 697, 705, 80 S.Ct. 725, 733, 78 A.L.R.2d 233, 242]; *Mancusi* v. *DeForte,* 392 U.S. 364, 368 [20 L.Ed.2d 1154, 1159, 88 S.Ct. 2120, 2123-2124]; *People* v. *Bradley, supra,* 1 Cal.3d at p. 84; *People* v. *Edwards, supra,* 71 Cal.2d at p. 1100), the more recent cases deemphasize the question of trespass and attempt to resolve the reasonable-

ness of the search by asking "whether the person [the accused] has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion." (*People* v. *Bradley, supra,* 1 Cal.3d at p. 84; *People* v. *Edwards, supra,* 71 Cal.2d at pp. 1104-1105; *People* v. *Willard, supra,* 238 Cal.App.2d at pp. 306-307.) The more recent approach is the more sound. It permits a consideration of the conflicting fundamental policy considerations and relegates the question of trespass to its proper place, that is, the question whether there has been an unreasonable governmental intrusion.

■ Since there was no search of the garage, our consideration of these questions is initially limited to the area of the search, the vicinity of the garbage cans. Defendant concedes that he had "no legitimate interest in the garage." It is to be inferred, therefore, that as to the area near the driveway in the vicinity of the garbage cans, he himself was a trespasser. Although we entertain considerable doubt whether a trespasser can be said to have a reasonable expectation of privacy on the private property of another (see *People* v. *Ortiz,* 276 Cal.App.2d 1, 5 [80 Cal.Rptr. 469]), we need not decide that issue. Moreover, even if it be assumed that defendant could avail himself of an expectation of privacy on the part of the owner or occupant of the property (cf. *People* v. *Martin,* 45 Cal.2d 755, 759-761 [290 P.2d 855]; *People* v. *Wilcox,* 276 Cal.App.2d 414, 416-417 [81 Cal.Rptr. 60]), defendant cannot prevail on this point, for, with respect to the area near the driveway in the vicinity of the garbage cans, neither he nor the owner or occupant could have had a reasonable expectation of privacy.

It will be remembered that the magistrate viewed the premises and specifically determined that there could be no reasonable expectation of privacy. Even though we have not had the benefit of viewing the property, the evidence is that the garage was only about one and a half car widths from the curbline of Cleo Street, and there is nothing whatever in the record suggesting that there was any impediment to the view of anyone passing by on Cleo Street of the area around the garbage cans. There is nothing in the record indicating that either defendant or the owner or occupant entertained a subjective expectation of privacy with respect to this area, but even if there were, under these circumstances no such expectation could be classified as reasonable. (Cf. *People* v. *Bradley, supra,* 1 Cal.3d at p. 85; *People* v. *Willard, supra,* 238 Cal.App.2d at p. 307; *People* v. *King, supra,* 234 Cal.App.2d at p. 432.)

■ Neither can it be said that Sergeant Babcock's conduct in looking around in the vicinity of the garbage cans was an "unreasonable govern-

mental intrusion." When a policeman has information that would reasonably support the need for further investigation, he may, in carrying out his duty to investigate, make minor trespasses on private property. (*People* v. *Terry, supra,* 70 Cal.2d at p. 427; *People* v. *King, supra,* 234 Cal.App.2d at pp. 428-433; see also cases discussed in *People* v. *Willard, supra,* 238 Cal. App.2d at pp. 298-305.) Unlike the situation in *People* v. *Edwards,* the officer here did not rummage in the garbage cans. The only thing he did was to get on hands and knees and look around the area, picking up some papers that were apparently scattered around the garbage cans. We conclude, therefore, that Sergeant Babcock's conduct did not constitute an unreasonable search.

■ Defendant contends, however, that, notwithstanding the contraband was lawfully discovered, the officer's seizure thereof was unlawful. First, he contends that the seizure was unlawful as an invasion of his own right of privacy or that of the rightful owner or occupant of the property on which the garage was situated. Assuming that a consideration of the right to privacy is germane to the legality of a seizure of contraband from, as opposed to a search of, an uninhabited outbuilding not involving a forcible entry,[2] there is ample evidence, both as to defendant and the rightful owner or occupant of the property on which the garage is situated, to support the magistrate's determination that there was no reasonable expectation of privacy. Since defendant concedes that he had no legitimate interest in the garage, the inference is that he himself trespassed upon the property and placed the contraband in the garage through the open space in the wall. We have already expressed our doubt as to whether one trespassing on the private property of another may have a reasonable expectation of privacy. (*People* v. *Ortiz, supra,* 276 Cal.App.2d 1, 5.) It is reasonably inferable from the evidence that the rightful owner or occupant did not even know of the existence of the contraband and, therefore, could not have had the required "subjective expectation of privacy" as to the contraband. (See *People* v. *Bradley, supra,* 1 Cal.3d at p. 85.) In any event, whoever placed the contraband in the garage left it "in plain sight" of anyone entering the garage or peering through the open space from outside the garage at a distance of 3 feet. Although we think it must be conceded that whoever did so entertained a hope that it would not be discovered, under the circumstances there could be no reasonable expectation of privacy. ■ "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment pro-

---

[2]"That [the Fourth] Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all." (*Katz* v. *United States, supra,* 389 U.S. 347, 350 [19 L.Ed.2d 576, 581, 88 S.Ct. 507, 510]; cf. *Alderman* v. *United States,* 394 U.S. 165, 176-177, 189-190 [22 L.Ed.2d 176, 188-189, 196, 89 S.Ct. 961, 968-969, 975-976].)

tection." (*Katz* v. *United States, supra,* 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507, 511]; see also *People* v. *Bradley, supra,* 1 Cal.3d at p. 85; *People* v. *Terry, supra,* 70 Cal.2d at p. 428; *People* v. *Willard, supra,* 238 Cal.App.2d at p. 307; *People* v. *King, supra,* 234 Cal.App.2d at pp. 429-433.)

Defendant next contends that the officer was not permitted to seize the contraband from the garage without obtaining a warrant. In support of this contention he cites *Johnson* v. *United States,* 333 U.S. 10 [92 L.Ed. 436, 68 S.Ct. 367]; *Agnello* v. *United States,* 269 U.S. 20 [70 L.Ed. 145, 46 S.Ct. 4]; *People* v. *Nichols,* 1 Cal.App.3d 173 [81 Cal.Rptr. 481]; *People* v. *Hobbs,* 274 Cal.App.2d 402 [79 Cal.Rptr. 281]; *People* v. *Hawkins,* 273 Cal.App.2d 529 [78 Cal.Rptr. 286]; and *People* v. *Superior Court,* 264 Cal.App.2d 165 [70 Cal.Rptr. 362]. A careful reading of these cases discloses that all of them actually stand for the proposition that probable cause to believe that contraband is present, no matter how well founded, does not justify a warrantless search therefor, if such search involves an unreasonable governmental intrusion into the constitutionally protected right of privacy.

In making this contention and in relying upon these cases, defendant confuses "probable cause to believe contraband will be found, which justifies the issuance of a search warrant, and observation of contraband in plain sight, which justifies seizure without a warrant." (*People* v. *Marshall, supra,* 69 Cal.2d 51, 57.) ▮ The rule is well established that, when a police officer, in the proper exercise of his duty to investigate, or during the course of an otherwise lawful search, is in a place where he has a right to be and sees contraband in plain sight, he may lawfully seize it without first obtaining a warrant. (E.g., *Ker* v. *California, supra,* 374 U.S. 23, 36-37 [10 L.Ed.2d 726, 740, 83 S.Ct. 1623, 1631]; *People* v. *Marshall, supra,* 69 Cal.2d at pp. 57-58 and cases there cited; *People* v. *Bradley, supra,* 1 Cal.3d at p. 85; *People* v. *Kampmann,* 258 Cal. App.2d 529, 532-533 [65 Cal.Rptr. 798]; cf. *Zap* v. *United States,* 328 U.S. 624, 628-630, 632-633 [90 L.Ed. 1477, 1481-1483, 1484, 66 S.Ct. 1277].)

▮ As we see it, the only remaining question is whether this well-recognized rule is inapplicable to the case at bench, because, in order to seize the contraband, Sergeant Babcock was required to insert his hand 10 to 12 inches inside the garage through the opening in the wall. Although, as we have seen, the propriety of *searches* of the uninhabited portions of private property involving minor trespasses have received much consideration (*People* v. *Bradley, supra; People* v. *Edwards, supra; People* v. *Berutko, supra; People* v. *Willard, supra; People* v. *King, supra*), there appear to be few, if any, cases discussing independently the pro-

priety of such a seizure. (Cf. *People* v. *Curley,* 12 Cal.App.3d 732 [90 Cal.Rptr. 783].)

 As in the case of searches, it is not all seizures that are constitutionally prohibited, only unreasonable seizures. (U.S. Const., Amend. IV; Cal. Const., art. I, § 19; *People* v. *Curley, supra,* 12 Cal.App.3d at p. 738; cf. *Terry* v. *Ohio, supra,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *People* v. *Hammond,* 54 Cal.2d 846, 853 [9 Cal.Rptr. 233, 357 P.2d 289]; *Bielicki* v. *Superior Court, supra,* 57 Cal.2d 602, 605.) Although the officer's sticking his hand through the opening in the wall 10 to 12 inches inside the garage could not be classified as a forcible entry, nevertheless it was technically an entry or trespass. As in the case of a search involving such a minor trespass, however, we do not think that the conflicting fundamental policy considerations involved in determining whether a seizure is reasonable ought to depend upon the words "entry" or "trespass" or upon technical rules of property. (Cf. *Jones* v. *United States, supra,* 362 U.S. 257, 266 [4 L.Ed.2d 697, 705, 80 S.Ct. 725, 733]; *Mancusi* v. *DeForte, supra,* 392 U.S. 364, 368 [20 L.Ed.2d 1154, 1159, 88 S.Ct. 2120, 2123-2124]; *People* v. *Bradley, supra,* 1 Cal.3d at p. 84; *People* v. *Edwards, supra,* 71 Cal.2d at p. 1100.) The problem involves a balancing between the rights of the individual and the rights of the public to proper and efficient law enforcement (see *People* v. *Willard, supra,* 238 Cal.App.2d at p. 307; *People* v. *Kampmann, supra,* 258 Cal.App.2d at p. 533), and we can see no valid reason why the test for reasonableness articulated in *People* v. *Bradley, supra,* 1 Cal.3d at p. 84 and *People* v. *Edwards, supra,* 71 Cal.2d at p. 1100 should not be applicable under similar circumstances to a seizure as well as a search. Indeed, in both of those cases seizures as well as searches were involved, and in *Bradley,* the seizure was held proper.

As we have already observed, neither defendant nor the rightful owner or occupant of the property could have had a reasonable expectation of privacy with respect to the contraband in the garage. Neither can Sergeant Babcock's reaching through the opening in the wall 10 to 12 inches into the garage to seize the contraband be classified as an unreasonable governmental intrusion. The contraband was in the plain sight of the officer who was lawfully and properly discharging his duty to investigate from a place where he had the right to be. The structure technically entered was not a habitation, and there was no forcible entry or breaking. The extent of the governmental intrusion was, under the circumstances, no greater than that involved in an officer reaching into a backyard barbecue (see *People* v. *Alexander,* 253 Cal.App.2d 691, 700 [61 Cal. Rptr. 814]), and, indeed, seems to us less offensive than peering into a

window of an inhabited structure (see *People* v. *Martin, supra,* 45 Cal. 2d at p. 762; *People* v. *Willard, supra,* 238 Cal.App.2d at pp. 296-297).

We hold, therefore, that, notwithstanding the technical trespass or entry required to seize it, the contraband was " 'fully disclosed and open to the eye and hand' " and, therefore, properly seized by Sergeant Babcock without first obtaining a warrant. (*People* v. *Marshall, supra,* 69 Cal. 2d at pp. 57-58; see also *Ker* v. *California, supra,* 374 U.S. 23, 36-37 [10 L.Ed.2d 726, 740, 83 S.Ct. 1623, 1631]; *People* v. *Bradley, supra,* 1 Cal.3d at p. 85; *People* v. *Kampmann, supra,* 258 Cal.App.2d at pp. 532-533.)

The order setting aside the information is reversed.

Gabbert, Acting P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied January 27, 1971, and respondent's petition for a hearing by the Supreme Court was denied March 16, 1971. Peters, J., was of the opinion that the petition should be granted.