[Crim. No. 24753. Second Dist., Div. Five. Dec. 4, 1974.]

THE PEOPLE, Plaintiff and Appellant, v.
WILLIAM HOWARD PARKER, Defendant and Respondent.

**COUNSEL**

Joseph P. Busch, District Attorney, Harry B. Sondheim and Sterling S. Suga, Deputy District Attorneys, for Plaintiff and Appellant.

Max Solomon and Ed Tolmas for Defendant and Respondent.

**OPINION**

**ASHBY, J.**—This is an appeal by the People (Pen. Code, § 1238, subd. (a)(1)) from an order setting aside counts I, XII, XIII, XIV, and XV of an information[1] following the granting of defendant's motion under section 995 of the Penal Code.

---

[1] Count I charged defendant with conspiracy (Pen. Code, § 182). The other enumerated counts charged defendant with various bookmaking activities (Pen. Code, § 337a).

The section 995 motion was directed to the validity of a search warrant. In ruling on the motion, the superior court was acting as a reviewing court. It had no power to reweigh evidence or to make findings of fact. On this appeal we are governed by the same standards of review as were applicable in the superior court. In reviewing the magistrate's decision we consider all the evidence which the magistrate considered, and all reasonable inferences therefrom which are supportive of the magistrate's findings. (*People* v. *Maltz*, 14 Cal.App.3d 381, 389-390 [92 Cal.Rptr. 216].) The evidence before the magistrate relevant to the validity of the search warrant was as follows:[2]

On December 23, 1972, Los Angeles Deputy Sheriff Garcia received an anonymous phone call advising him that by dialing the number 686-1627 bets could be placed on horse races all over the country. Garcia had been a peace officer for six years and was assigned to the bookmaking detail. Garcia ascertained that the phone number in question was located at 9918 Rio Hondo Parkway, apartment D, in El Monte, that the subscriber was a Shirley Christensen, and that there was another phone number at the location.

On December 27, 1972, Garcia commenced surveillance of 9918 Rio Hondo Parkway. He saw one Alvin Lingo[3] enter apartment D at 9:40 a.m., carrying a National Daily Reporter. Lingo left the location at 5:20 p.m. At noon that day Garcia observed one Jacob Jackson[4] enter the location carrying numerous papers and portfolios. Jackson left at 5:30 p.m., again carrying papers and portfolios.

Garcia and Deputies Groninga and Roop[5] kept Lingo under surveillance from December 27, 1972, until March 7, 1973, the date they executed the affidavit in support of the warrant. On days when local race tracks were operating Lingo would leave his home at about 9 a.m., drive to a liquor store, purchase a National Daily Reporter, then proceed directly to 9918 Rio Hondo Parkway, apartment D. He would remain there until about 5:30 p.m., when he would return to his home. On

---

[2]The evidence was contained in the affidavit in support of the warrant which consisted of an 18-page statement of the investigating officers' observations and a 7-page statement of the conclusions which Deputy Garcia drew from the information gathered in the course of the investigation.

[3]Garcia ascertained Lingo's identity through the license number of the car he drove. Lingo had a criminal record.

[4]Jackson's identity too was determined through an auto license. Garcia also obtained an address for Jackson in this way—227 Orange Blossom Street, La Puente.

[5]Co-signators of the affidavit.

December 28, 1972, Lingo arrived at the Rio Hondo apartment at about 9:47 a.m. Jacob Jackson arrived at 10:30 a.m., carrying a clipboard and papers which he covered with a red shawl before entering the apartment. At 10:37 a.m., Patricia Jean Jackson arrived at the location carrying a racing form and a newspaper. Ms. Jackson had previously been arrested for bookmaking by Garcia. She remained at the Rio Hondo apartment only five minutes. She left without the racing form and the newspaper.

On January 16, 1973, Lingo started using apartment 15 at 9918 Rio Hondo Parkway. On February 2, 1973, Garcia contacted the manager of the Rio Hondo apartment building and learned that apartment D had been rented by Patricia Jackson using the name Shirley Christensen. Both she and Jacob Jackson paid the rent on the apartment, always in cash. Lingo used the name Ray Morriss when he rented apartment 15.

At 2:50 p.m., January 3, 1973, Garcia observed Jacob Jackson leave the Rio Hondo apartment carrying a cardboard box. Jackson drove to a hardware store at which time Deputy Roop observed what appeared to be a betting marker next to the cardboard box. On January 4 and January 5, 1973, Garcia observed Jackson leave his residence at 227 Orange Blossom Street and drive directly to 12132 Sitka Street, apartment 18, El Monte. On both days Jackson remained at the Sitka location for the entire morning. Garcia contacted the apartment manager at the Sitka location. She identified a photograph of Patricia Jackson as the person who had rented apartment 18 under the name of Mrs. Davis. During the course of his further investigation Garcia contacted the phone company and learned that the telephone in the Sitka Street apartment was listed in the name Donald Harris. He further learned that during the period January 4, 1973, to February 2, 1973, 240 calls were made from that telephone to the Turfmaster Wire Service which informed subscribers of the latest horse racing results and betting odds on sports events.

On January 6, 1973, James Register was observed to be using apartment 18 at 12132 Sitka. Garcia knew Register to be a bookmaker who was last arrested in November 1972. Register was kept under surveillance and was seen to leave his residence at 4328 Cypress, El Monte, at 8:30 a.m. on days local tracks were operating, purchase a newspaper, then proceed directly to 12132 Sitka, apartment 18. Register would remain there until 6 p.m., then drive home. This behavior was observed about 20 times between January 6 and February 21, 1973. On

January 9, 1973, and January 12, 1973, Garcia saw Register take papers and what appeared to be records out of the Sitka apartment.

On February 5, 1973, Jacob Jackson was tending bar in El Monte. Garcia observed numerous bar patrons discussing horse racing and the losses they had sustained to their bookie. A patron named Andy mentioned losing $80. He gave Jackson a check for that amount. Jackson took a piece of paper out of his pocket, and stated, "that's right." Jackson gave some patrons money after looking at the piece of paper. A patron named John talked to Jackson about losing money. Jackson looked at the piece of paper and then collected some money from John.

On February 7, 1973, Garcia was again maintaining surveillance of the bar in El Monte. He observed John place a telephone call from a pay phone outside the bar to 579-3773. Garcia overheard John say, "Ryder, John B. again, give me $10 to win on Banchory Jim Jon in the fifth. Yeh, I settled up with Jake on Monday." Garcia learned at the bar that Jackson was nicknamed Jake. The phone number which John had called was located at 9918 Rio Hondo Parkway, apartment 15. Garcia contacted Groninga who had the apartment under surveillance and learned that Lingo was the only one inside at the time of the call.

From February 6 to February 16, 1973, the affiant deputies maintained surveillance of 5023 Rosemead Boulevard, apartment 3.[6] The telephone number at the location was listed to a Sheila Hopper. Deputy Groninga ascertained that the apartment was the residence of defendant herein who was known to officers from past bookmaking arrests, the most recent in September 1972.

On February 7, 1973, Groninga observed defendant and an unknown female companion leave the Rosemead apartment and drive to a meat market in Arcadia. There numerous people came up to defendant and conversed briefly with him. During these conversations the people would point to a copy of the National Daily Reporter. Defendant would escort each person to the back of the market, remain there a few minutes, then return and repeat the procedure with another person. When he left the market defendant drove to a bar where he engaged several patrons in discussions about horse racing. After each discussion defendant went outside the bar to use the telephone. From the bar defendant went to a bowling alley where, again, numerous people would look at the racing

---

[6]The affidavit does not indicate how or why the officers were led to the location.

section of a newspaper, then talk to defendant and point to the racing section. Defendant would write on a piece of paper during these conversations. At the conclusion of each conversation defendant's female companion would place a call on a pay phone.

By checking telephone records, Garcia learned that calls were placed to the Rosemead apartment from 227 South Orange Blossom 59 times in November and December 1972. Phone calls were also placed from 227 South Orange Blossom to the unlisted number of one Sam Lisner, known to Garcia and other officers to be the boss of various bookmaking operations. Lisner's number was called 73 times in November 1972, 117 times in December 1972, and 12 times in January 1973. On racing days there were an average of six to seven calls daily, on non-racing days there was only one call a day. There were a total of 21 calls made to Lisner's number from 12132 Sitka, apartment 18, between January 5, 1973, and March 7, 1973, all of them on racing days, during racing hours. There were also calls placed to the Lisner residence from 9918 Rio Hondo Parkway and from 5023 Rosemead.

On February 21, 1973, Garcia observed Lingo leave 9918 Rio Hondo and go to 12132 Sitka, apartment 18. At the latter site Garcia met Groninga who informed him that Register had been inside apartment 18 all day. At about 6:30 p.m., Garcia observed Lingo and Register leave the apartment. Register was carrying a green plastic trash bag which he placed in a large trash receptacle at the north side of the apartment house. Garcia went to the trash receptacle and discovered that it was used by approximately 60 persons in the 19-unit apartment building. There was a large amount of trash in the receptacle, but there was only one green trash bag. Garcia removed the bag and opened it. Inside he found:

Ten daily tally sheets showing names of agents—one of which had a bet with "John";

Eighty slips of paper showing payoffs on winning horses at Santa Anita;

Ten National Daily Reporters, all marked;

Forty-nine slips of paper showing weekly owes and pays to bettors, including a notation to collect $80 from "Andy";

Twelve slips of paper showing daily owes and pays to agents;

Sixty-two pieces of paper showing point spreads and monies bet on basketball games:

One hundred six pieces of paper showing monies bet on each race at Santa Anita: and

A telephone bill for a special toll free number installed at 9918 Rio Hondo Parkway, apartment 15.

Based on his expertise as a bookmaking vice officer, Garcia formed the opinion that the items recovered from the trash can reflected that the Sitka and Rio Hondo apartments were being used to conduct bookmaking activities involving 18 agents and 75 to 100 bettors. Furthermore, in addition to the above enumerated items, Garcia found defendant's name, address and telephone number listed in the records recovered from the trash bin. The records established that defendant received $200 a week as an employee of the organization. Garcia was able to correlate 12 of the bets recorded on the materials in the trash bin with defendant. It was Garcia's expert opinion that defendant was an agent and clerk for the organization, that he kept records of sports action and called this action to the organization's back office, and that he kept records of his bettors and the amounts of their bets at his residence so he could make payoffs as reported to him by Jacob Jackson and Register.

Garcia and Groninga consulted with Lieutenant Graydon and Deputy Stockton, both of whom had extensive experience in bookmaking law enforcement. They provided the affiant officers with background information on Sam Lisner and the customary characteristics of the organizations he headed. Lisner's operations were unique in that he trusted no one and therefore required his agents to call him regularly to report what was happening; whereas, most bookies try to keep calls to a minimum to avoid their being traced. Graydon and Stockton identified a number of the names on the records in the trash bins as prior associates of Lisner.

Garcia concluded, on the basis of his total investigation, that 9918 Rio Hondo, apartment 15, and 5023 Rosemead, apartment 3, were relay spots and that 12132 Sitka, apartment 18, and 227 South Orange Blossom were back offices and that 8911 Reydon, Downey, the residence of Sam Lisner, was the permanent back office of the bookmaking organization.

Defendant was arrested when he arrived at 5023 Rosemead, apart-

ment 3, while that location was being searched pursuant to a warrant. At the preliminary hearing defendant moved to quash the search warrant.[7] In denying the motion the magistrate indicated his belief both that the warrantless search of the trash can was valid and that there was sufficient evidence apart from that disclosed through the search of the trash can to justify the issuance of the warrant. At the hearing on the section 995 motion the prosecutor stated that he agreed with defense counsel that the issue was the search of the trash can. The court granted the section 995 motion because it found that there was no evidence that a warrant to search the trash can could not have been obtained.

On this appeal the People assert both that the search of the trash can was lawful and that there was sufficient evidence, apart from that search, to justify issuance of the warrant. Although this latter argument was not pursued at the section 995 hearing, the People are not now precluded from raising the issue since it was presented to and decided by the magistrate at the preliminary hearing. (*People* v. *Maltz, supra,* 14 Cal.App.3d 381, 389.) Furthermore, we agree with the magistrate that if the information secured through the search of the trash can is excised from the affidavit in support of the warrant, the remaining facts known to the affiant officers, viewed in the context of their expertise which is fully set forth in the affidavit and supporting document, were ample to justify the issuance of the warrant. (*Theodor* v. *Superior Court,* 8 Cal.3d 77, 97 [104 Cal.Rptr. 226, 501 P.2d 234].) The evidence secured from the trash can was basically only corroborative of information already known to the officers, set forth in great detail above, at least insofar as the locations described in the search warrant were concerned.

We further hold that the superior court erred in finding the search of the trash can improper. In *People* v. *Dumas,* 9 Cal.3d 871, 882-884 [109 Cal.Rptr. 304, 512 P.2d 1208], the Supreme Court determined that exterior trash receptacles should be accorded no greater degree of privacy than automobiles. Thus, they may be searched upon probable cause[8] and upon a showing that "delay would enhance the possibility the articles would be destroyed or placed beyond the reach of the officers." (9 Cal.3d at p. 883.) The rule was first laid down as to

---

[7]The record on appeal contains the warrants which authorized searches at 5023 Rosemead, apartment 3, and 12132 Sitka, apartment 18. Presumably warrants were also issued, as requested in the affidavit, for searches of 9918 Rio Hondo, 227 South Orange Blossom and 8911 Reydon. The motion to quash was made jointly with other defendants not parties to this appeal and apparently extended to searches of all the enumerated locations.

[8]The trial court apparently concluded, as did the magistrate, that there was probable cause for the search. The facts set forth above support such a conclusion.

automobiles in *Carroll* v. *United States*, 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790]. It had its genesis in the court's recognition that the mobility of automobiles rendered it impractical to seek a warrant when there was probable cause to believe that the vehicle contained contraband. Through the years a considerable body of law has developed regarding automobile searches. The focus of these cases has been on the particular facts constituting probable cause in each instance. The properties of the automobile which make it impractical to obtain a warrant have remained constant and have, therefore, received less attention.

There is, of course, no comparable body of law regarding trash cans since the rules governing their warrantless search have only recently been propounded. *(People* v. *Dumas, supra.)* However, by analogy to the automobile cases, we must conclude that the characteristics of trash receptacles which render them impractical subjects for search warrants are obvious, remain fairly constant and usually may be found by inference in a particular case. Materials placed in trash cans, being placed there for removal and disposal, are highly portable. While trash is typically removed on a specific ascertainable day and within certain circumscribed hours, it is just as typically not subject to the security precautions people normally take with respect to property they intend to keep. Trash placed in a common receptacle used by multiple apartment dwellers is especially likely to be tampered with. Trespassory incursions into exterior trash receptacles by human and animal foragers, although unwelcome are not totally unexpected. People normally do not take particular pains to assure that the contents of their trash bins will not be damaged by the weather and the likelihood of weather damage is increased when many people regularly use the receptacle. Given these common attributes of trash receptacles which diminish the reasonable expectation of privacy as to their contents and make it impractical to obtain a warrant, minimal additional circumstances need be shown by the People in any particular case to justify their dispensing with a warrant. In the instant case such justification is found in the fact that it was unexpected and unforeseeable that the officers would come upon the trash as they did and that the trash was commingled in a receptacle used by 60 people. *(People* v. *Stewart,* 34 Cal.App.3d 695 [110 Cal.Rptr. 227].) Any effort to have obtained a warrant under the circumstances would not only have enhanced the possibility that the evidence would be placed beyond the officers' reach, but could very likely have resulted in the premature disclosure of the ongoing investigation to the potential defendants thereby thwarting its successful conclusion.

In *Dumas, supra,* the subject of trash can searches was discussed in relation to the court's decision in *People* v. *Krivda,* 5 Cal.3d 357 [96 Cal.Rptr. 62, 486 P.2d 1262]. For that reason the discussion focused on the question of what rules are applicable to trash cans placed at the curb for immediate removal, the situation which obtained in *Krivda.* We do not believe, however, that the court thereby intended to draw any hard and fast distinction between trash which is at curbside and that which is still on the exterior premises of an apartment house. Rather, the distinction which the court drew was between "fishing expeditions" where the officer lacked probable cause to believe the trash can contained contraband and those situations where such probable cause existed, as was the case herein. Again, analogy with the automobile cases is helpful. Searches of vehicles have been upheld not only where the vehicle was in transit on the highway, but where it was parked at a curb, adjacent to or far from the defendant's home, and even when it was parked in a common garage area of the defendant's apartment. (*People* v. *Dumas, supra,* 9 Cal.3d 871, 883.) Parallel reasoning requires a similar result to apply to trash in a common receptacle adjacent to a large apartment.

For the foregoing reasons, the search warrant which was obtained following the search of the trash can was properly issued.

The order appealed from is reversed.

Kaus, P. J., and Stephens, J., concurred.