[No. B010122. Second Dist., Div. One. July 24, 1986.]

THE PEOPLE, Plaintiff and Appellant, v.
DWAYNE IRVINE PROFIT et al., Defendants and Respondents.

**COUNSEL**

Ira Reiner, District Attorney, Donald J. Kaplan and Richard W. Gerry, Deputy District Attorneys, for Plaintiff and Appellant.

James M. Hallett, under appointment by the Court of Appeal, Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Thomas Case and Victor Salerno, Deputy Public Defenders, for Defendants and Respondents.

## OPINION

### HANSON (Thaxton), J.—

#### INTRODUCTION

The People appeal from the superior court's granting defendants' motion made pursuant to Penal Code section 995[1] to dismiss the information based on the ground of violations of defendants' Fourth Amendment rights.

Pursuant to California Rules of Court, rule 12a, we have augmented the record on appeal by ordering up the superior court file with all exhibits (file No. A909742) and have examined same.

#### PROCEDURAL HISTORY

*On October 30, 1984,* a preliminary hearing was conducted in Division 91 of the Los Angeles Municipal Court (Hon. Richard G. Berry, Judge Presiding). Motions by defendants Profit, Dawkins and Manuel to dismiss the complaint based on violation of their Fourth Amendment rights were denied. Defendants were held to answer. Bail was set at $50,000 each.

*On November 13, 1984,* the District Attorney of Los Angeles County filed an information charging all three defendants with the felony of "possession for purpose of sale of a controlled substance, to wit, phencyclidine" (PCP) on October 15, 1984, in violation of Health and Safety Code section 11378.5. In a second count, defendant Profit was charged with assault with a deadly weapon (PCP) by means of force likely to produce great bodily harm upon a peace officer (Justin Moore) in violation of section 245, subdivision (b). The court appointed separate counsel at public expense to represent each of the defendants.

*On January 8, 1985,* all three defendants made a motion to dismiss the information (charges) in the superior court, department SWK (Hon. Edward A. Hinz, Jr., Judge Presiding) pursuant to section 995 on the grounds that their Fourth Amendment rights were violated. By stipulation of all counsel, the hearing was based solely on the testimony contained in the transcript of the preliminary hearing. The court granted the motion of all three defendants. The People appeal.

---

[1]Unless otherwise indicated, all code references are to the Penal Code.

## FACTS

As noted, the section 995 motions in the superior court to set aside the information were submitted *solely* upon the transcript of the preliminary hearing conducted in the municipal court on October 30, 1984.

At the preliminary hearing, Federal Agent Lynn Wood was the *only* witness who testified about events leading to defendants' arrest. Wood, a special agent with the United States Department of Justice, Drug Enforcement Administration (DEA), had 16 years of training and experience in the investigation of controlled substances, including about 100 cases involving possession for sale of PCP. Wood was assigned to the Los Angeles International Airport detail.

Agent Wood's testimony is undisputed. The defendants called no witnesses and did not personally testify at either the preliminary hearing in the municipal court or the section 995 hearing in the superior court.

Agent Wood's testimony, in relevant parts, can be summarized substantially as follows:

At the time of the events under review—October 15, 1984, at approximately 1:15 p.m.—Agent Wood was near the American Airlines ticket counter at Los Angeles International Airport when he observed defendants Profit, Dawkins and Manuel enter the American Airlines ticket counter area. They appeared extremely nervous, carried very little luggage, and separated as they approached the ticket counter, with Dawkins and Manuel staying behind while Profit paid cash for three airline tickets. He noted especially that Dawkins was looking all around the area and on several occasions turned his back on Profit. After the tickets were purchased, all three defendants continued looking around and over their shoulders as they departed the ticket area through the luggage scanning mechanism and walked down a long hallway toward the boarding gates.

In the American Airlines boarding area, defendants were unable to board because no seats were available in the aircraft. The three defendants showed signs of "extreme nervousness." Agents Wood and Woessner walked toward the three defendants. Defendant Profit was in front, followed by defendant Manuel. Agent Wood, in plain clothes, approached defendant Profit. Agent Wood said, "I am a federal narcotics agent, I would like to talk to you a minute," displayed his badge, and advised Profit that "you are not under arrest, I am not detaining you, you are free to leave and not speak to me if you don't want to."

As Agent Wood was identifying himself to Profit, with Manuel close by, defendant Dawkins dropped back behind defendants Profit and Manuel and changed his direction of movement. Agent Wood motioned for Dawkins to join the other two, which he did. (Wood testified that he motioned Dawkins over to join Profit and Manuel because it was his opinion that all three defendants were together and Dawkins was trying to avoid apparent association with the other two.)

Agent Wood then spoke to all three defendants as a group. Wood identified himself and explained to all three defendants that he was conducting a narcotics investigation; that he would like to talk to them; and that if they did not wish to talk with him they were free to leave at any time. All three defendants acknowledged that they understood by saying "Yes, I understand," nodding of a head, or responding "uh-uh" in a positive manner. "None of them made an attempt to leave."

When Agent Wood asked all three defendants if they had any identification, they stated that they did not have any. Defendant Profit handed over the three airline tickets he had purchased with cash and said "here are our tickets." After looking at the tickets, Agent Wood gave them back to Profit.[2]

When asked how long they had been in Los Angeles, all three defendants responded that they had been in Los Angeles about two weeks, visiting relatives. Agent Wood then asked all three if they were carrying narcotics in their luggage; all said "no."

Agent Wood then asked defendant Profit if he could look in his briefcase and he (Profit) said, "Yeah," whereupon Profit opened his briefcase "by turning the combination lock and pulling the latches." After the briefcase was opened, Agent Wood observed "immediately inside the briefcase, laying on top, a large, legal-sized, yellow tablet with certain notations on it in pencil." (People's exhibit 1—see appen. A.) (Agent Wood testified that based on having seen similar "pay-and-owe" and price per ounce notations on several hundred occasions and investigations, he believed that the yellow tablet was a narcotics sales ledger sheet.)

Agent Wood also observed in the open briefcase an American Airlines ticket coupon bearing the name "Robert Webb," indicating travel from Dallas, Texas on October 13, 1984 (People's exhibit 2—see appen. B). This name did not match "Haywood Hill," the name on the American Airlines

---

[2]The following colloquy occurred on redirect examination:
"Q. Agent Wood, after defendant Profit presented the tickets to you did you keep those or did you give them back to defendant Profit?
"A. I handed them back to him."

ticket Profit had handed Wood and the name by which Profit identified himself to Wood. Agent Wood then asked Profit if he was Mr. Webb and had in fact traveled to Los Angeles two days prior.

Profit became noticeably more nervous, "gave no verbal response and began to perspire heavily and his hands began to shake." Profit said, "This is pretty embarrassing." Agent Wood asked Profit if he would like to continue the conversation in Wood's office. Profit replied, "Yeah, let's do that," or "Yeah, that's a good idea." Agent Wood turned to Dawkins and Manuel and said, "Is that okay with you?" Both gestured affirmatively. Agent Wood a third time told defendants that they were not under arrest and were not being detained, that this was strictly a voluntary situation on their part, and that they could leave at any time they wished.

The party—Agents Wood and Woessner, and the three defendants—then started walking toward the front of the terminal to the DEA office, with Profit carrying his briefcase[3] and the three airline tickets (see fn. 2, *ante*). When Agent Moore joined them en route, Profit asked who he was. Agent Wood answered that Moore was another federal agent working with them.

When they stopped near the Trans World Airlines area, Profit asked if he was free to leave and Agent Wood told him that he was. Profit then asked what would happen if he had just a little marijuana in his pocket. Agent Wood advised him that if it was under an ounce a citation would be written and he could still catch the next American Airlines flight, which was at 3:30 p.m. (Agent Wood testified that initially the three defendants were not suspects but rather subjects of an investigation. After Profit asked Agent Wood what would happen to him if he had a small amount of marijuana in his pants or in his possession, he (Profit) became a suspect.)

The group walked 100 or 150 yards further. When they arrived in the vicinity of the door of the DEA office, Profit again wanted to know if he was under arrest. Agent Wood again told him that he was not under arrest

---

[3]On cross-examination of Agent Wood by Attorney Levy who represented defendant Profit, the following colloquy occurred:

"Q. As you were walking to the office, did you indicate to him [Profit] he could leave?

"A. Yes.

"Q. Who was carrying the briefcase?

"A. Mr. Profit was.

"Q. Had you taken anything out of the briefcase at that point?

"A. I had taken the articles out to look at them and I believe that I had replaced them in the briefcase.

"Q. So you were not carrying any of the property inside the briefcase?

"A. No."

and that all three were free to leave.[4] Suddenly Profit struck Agent Moore in the chest and face with his hands and started to run away at full speed. Agent Moore regained his balance and began to pursue Profit. When Agent Moore was about 10 feet behind Profit, Profit (who was wearing a sport coat) reached into his waistband, produced a dark, amber-colored glass bottle, removed the top, looked back over his shoulder at Agent Moore and threw the opened bottle over his shoulder directly at Agent Moore. The bottle landed two or three feet in front of Agent Moore. Liquid from the opened bottle splattered about the area. The liquid smelled very strongly of ether. Agent Wood initially joined in the pursuit of Profit but after Profit threw the bottle at Agent Moore, he ceased pursuit and retrieved the bottle (People's exhibit 3—see appen. C). (Agent Wood testified that based upon his experience and knowledge, and the strong odor of ether, he formed the immediate opinion that the bottle contained liquid PCP.) Agent Wood returned to defendants Dawkins and Manuel and placed them both under arrest and escorted them into the DEA office.

Agent Wood testified that his decision to arrest defendants Dawkins and Manuel was based on the circumstances which led him to conclude that all three defendants had engaged in a conspiracy to transport PCP via American Airlines to Texas. He based that judgment on these observations: "That all three defendants had been together, that there had been a meeting, that Mr. Profit had in fact paid for all three airline tickets, that Mr. Profit definitely had P.C.P. and the other two defendants had assisted him or were members of the conspiracy with him to transport the P.C.P."

Following their arrest, Dawkins and Manuel were placed in two separate rooms. Agent Wood heard an audible thud from the hallway, and upon entering the room where Dawkins was seated observed that Dawkins had thrown a liquor bottle underneath the table in the interview room. Subsequently, in a "pat-down," three liquor bottles of the similar type Profit threw at Agent Moore were removed from defendant Manuel (People's exhibits 4, 5 and 6—see appen. D). Defendant Dawkins had four liquor

---

[4]On cross-examination of Agent Wood by Attorney Kricun who represented defendant Manuel, the following colloquy occurred:

"Q. So at the point Mr. Manuel was placed under arrest the only thing that had been thrown was this one bottle?

"A. Correct.

"Q. And the last time you advised all three of these people they were free to leave was at the back door of the D.E.A. office?

"A. Correct.

"Q. Just before Mr. Profit ran?

"A. Correct.

"Q. So at that point, if each of them wished to have walked away, they could have?

"A. Yes."

bottles in his possession (People's exhibits 7, 8, 9 and 10—see appen. E). Except for the bottle Dawkins attempted to dispose of in the interview room, all of the bottles were found in the interior coat pockets, pants pockets and waistbands of Dawkins and Manuel.

Defendant Profit, after fleeing, was arrested a short time later by Los Angeles Police Officer Paul Witzlib, who had joined Agent Moore in pursuit of Profit. Profit was apprehended on the third level of a nearby parking structure attempting to hide under a car. When arrested, the upper portion of Profit's body was under the car and the lower portion of his body was sticking out. Another brown liquor bottle was found under the car next to Profit (People's exhibit 11—see appen. C).

All nine (9) liquor bottles carried by the three defendants were turned over to the hazardous chemical response unit of the Los Angeles Police Department and booked as evidence. The prosecuting attorney and all three defense counsel stipulated at the preliminary hearing that Steve Johnson, a qualified expert forensic chemist, if called and duly sworn, would testify that he performed a physical and chemical analysis of the contents of the bottles and formed the opinion that the contents of the bottles was as follows: People's exhibit No. 3 (appen. C)—contained 25 milliliters of liquid PCP; People's exhibit No. 4 (appen. D)—contained 108 milliliters of liquid PCP; and that People's exhibit Nos. 5, 6, 7, 8, 9, 10, 11 (appen. D and E)— contained 200 milliliters of liquid PCP.

Agent Wood testified that it was his opinion that the three defendants possessed the bottles for the purpose of transporting the PCP out of state for sale. This opinion was based upon the large amount of PCP in the joint possession of the defendants and the ledger sheet in defendant Profit's briefcase.

MOTIONS TO SUPPRESS AND DISMISS AT THE PRELIMINARY HEARING

At the preliminary hearing counsel for all three defendants objected to the admission of the People's exhibits; defendant Profit on the grounds that they were the product of an illegal detention; defendant Dawkins on the grounds that he was illegally detained and subsequently arrested without probable cause; and defendant Manuel objected by implication to the admission of People's exhibit without voicing precise grounds.

The record is clear from the magistrate's express comments from the bench, and from admitting into evidence People's exhibit numbers 1 through 11 (appends. A through E) and denying motions to dismiss, that he found that under the sequence of events as testified to by Agent Wood that the

law enforcement officers acted reasonably and did not violate the defendants' Fourth Amendment rights.

### SECTION 995 MOTIONS TO DISMISS BEFORE THE SUPERIOR COURT

At the section 995 motion to dismiss before the superior court, counsel for all three defendants, by stipulation, submitted the matter *solely* on the transcript of the preliminary hearing; defendant Profit argued, as he did at the preliminary hearing, that he was illegally detained; defendant Dawkins conceded that up until he was arrested that he was not detained but argued that the police lacked probable cause to arrest him; and defendant Manuel argued that the initial encounter constituted an unlawful detention and that the police lacked probable cause to arrest him.

After reading the transcript of the preliminary hearing and argument by counsel, the superior court dismissed the information as to all three defendants (Profit, Dawkins and Manuel), and stated: "The court has reviewed the transcript very carefully in light of the Wilson case [*Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 (195 Cal.Rptr. 671, 670 P.2d 325); cert. den. *California* v. *Wilson* (1984) 466 U.S. 944 (80 L.Ed.2d 474, 104 S.Ct. 1929)], and is of the view that the detention was illegal as set forth in the transcript."

### ISSUES

On appeal the People contend that the superior court committed reversible error by granting defendants' section 995 motion to dismiss arguing 1) that defendants were not illegally detained, and 2) that Agent Wood had probable cause to arrest defendants Dawkins and Manuel. (Unquestionably there was probable cause to arrest Profit and he does not contend otherwise on appeal).

Thus, the determinative issues raised on appeal can be distilled into two questions: 1) whether defendants were unlawfully detained up to the point in time when defendant Profit struck Agent Moore and ran, throwing an opened liquor bottle containing liquid PCP at Moore; and 2) whether Agent Moore thereafter had probable cause to arrest defendant Dawkins and Manuel.

### STANDARDS OF REVIEW

The standard of review the superior court and this court must apply in the instant case was recently set forth in *People* v. *Laiwa* (1983) 34 Cal.3d 711 [195 Cal.Rptr. 503, 669 P.2d 1278]. ■ The *Laiwa* court at page 718, explaining the different standards involved in motions pursuant to

sections 995 and 1538.5, stated: "[I]n ruling on a motion under section 1538.5 the superior court sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences, and hence . . . on review of its ruling by appeal or writ all presumptions are drawn in favor of the factual determinations of the superior court and the appellate court must uphold the superior court's express or implied findings if they are supported by substantial evidence. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 21].) By contrast, in proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664], and cases cited.) On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. (*People* v. *Maltz* (1971) 14 Cal.App.3d 381, 389 [92 Cal.Rptr. 216]; see generally *People* v. *Sanchez* (1972) 24 Cal.App.3d 664, 690, fn. 15 [101 Cal.Rptr. 193].)" (See also *People* v. *Roberts* (1972) 26 Cal.App.3d 385, 389 [103 Cal.Rptr. 25].)

In the case at bench, it is clear from the augmented record on appeal that the moving papers in the superior court sought to set aside the infoi mation pursuant to section 995. The superior court's minute orders of January 8, 1985, as to each defendant (Profit, Dawkins, and Manuel) also states: "Motion pursuant to section 995 Penal Code granted." However, only one witness (Agent Wood) testified at the preliminary hearing in the municipal court to the events out of which this case arose, and thus there was no weighing of conflicting testimony. ■ "Because the facts bearing on the legality of the detention in this case are undisputed, there is no factual issue entitled to a substantial evidence standard of review: rather, it is the ultimate responsibility of this court to measure the facts as found by the trier against constitutional standards. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)" (*People* v. *Aldridge* (1984) 35 Cal.3d 473, 477 [198 Cal.Rptr. 538, 674 P.2d 240].)

## DISCUSSION

With the foregoing in mind, we conclude that the superior court misapplied *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777 to the undisputed facts of the instant case and erred in granting defendants' motion to dismiss the information. Our independent review of the entire record leads us to conclude that the defendants were not unlawfully detained and there was probable cause to arrest Dawkins and Manuel.

## I.

*Were defendants Profit, Dawkins, and Manuel unlawfully detained?* No.

■ Preliminarily, the state Supreme Court in *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777, after analyzing relevant United States Supreme Court decisions, listed three categories governing warrantless investigatory activities frequently undertaken by law enforcement officers in an airport setting in the Fourth Amendment context.

The *Wilson* court stated at page 784: "For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. *First,* there are what Justice White termed 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no 'seizure,' however minimal—and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] *Second,* there are what are commonly termed 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] *Third,* and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime.' [Citation.]" (Italics added.)

### WILSON DISTINGUISHED

In the case at bench the superior court, after reading the preliminary hearing transcript, dismissed the information as to all three defendants on the basis that all three defendants had been detained, citing as authority *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777. The superior court, however, misconstrued *Wilson,* which held that defendant Wilson had been detained. By contrast, the single fact underpinning the *Wilson* holding is absent in the instant case. Relevant language in *Wilson* clearly supports the conclusion under the facts of this case that all three defendants merely experienced a "consensual encounter" and were not "detained."

In *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777, 790,[5] the court concluded that Justice Stewart's opinion in *United States* v. *Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870], rehg. den. 448 U.S. 908 [65 L.Ed.2d 1138, 100 S.Ct. 3051] articulated, at page 554 [64 L.Ed.2d at p. 509], the standard as to whether or not "detention" occurred. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

The *Wilson* court stated at page 787, "the determinative issue is whether at the time of his consent Wilson was 'detained' for Fourth Amendment purposes or whether he was simply engaged in a 'consensual encounter.'" The *Wilson* court further refined the issue at page 790: "Thus, the question before us is whether, at the time Wilson consented to the search of his attache case, a reasonable person in Wilson's position would have believed that he was not free to leave."

In resolving that issue, we quote at length from pages 790 and 791 of *Wilson*: "Reviewing the facts of this case in light of this standard and the relevant portions of [*Florida* v.] *Royer* [(1983) 460 U.S. 491 [75 L.Ed.2d

---

[5]In *Wilson,* Detective Kaiser, a Los Angeles Police Officer assigned as an undercover narcotics agent at the Los Angeles International Airport, approached Wilson, who had previously deplaned on a Pan American flight from Miami, Florida, while he was standing at the open trunk of his car. (Kaiser testified that at that point he "had a slight suspicion" that Wilson "possibly" was involved in criminal activity, and that his purpose in speaking to Wilson was to request permission to search his luggage.) As Kaiser approached Wilson he displayed his police identification, told him that he was a police officer and asked Wilson if he "might have a minute of his time." When Wilson responded, "Sure," Kaiser testified that "I advised Mr. Wilson that I was conducting a narcotics investigation, *and that we had received information that he would be arriving today from Florida carrying a lot of drugs.*" (Italics added.) (*Wilson* v. *Superior Court, supra,* 34 Cal.3d 777, 781; fn. omitted.)

After having told Wilson that he had information that Wilson was carrying "a lot of drugs," Kaiser asked if he could search the two pieces of luggage that his companion had just set on the curb and the box which had been placed inside the car. Wilson allegedly responded, "Sure, I don't have any drugs that I know of. Go ahead and search." Detective Kaiser then asked Wilson to search his attache case. Wilson said, "There should only be some papers in there, but you can go ahead and look, if you like" and placed the case on the rear seat of the car and opened it. Kaiser, upon searching through the attache case, found a glass vial. Wilson allegedly stated, "That's just a little bit of hash oil in there." After examining the bottle and concluding that it did contain hashish oil, Kaiser asked Wilson "if he would mind accompanying [him] back to the narcotics office situated at the airport . . . ." Kaiser testified that at that point Wilson was actually under arrest, although Kaiser had not so informed him. At the office, Kaiser continued his search of the attache case and found another small glass vial, containing a substance resembling cocaine, inside an eyeglass case. Wilson was then formally placed under arrest and taken into custody. (*Wilson, supra,* 34 Cal.3d at pp. 782-783.)

229, 103 S.Ct. 1319]], it is evident that Detective Kaiser did not detain Wilson, for federal constitutional purposes, merely by approaching him, identifying himself as a police officer, and asking if he might have a minute of his time. At that point, however, the officer did not simply ask Wilson if he would permit a search of his luggage. Instead, he advised Wilson that he was conducting a narcotics investigation and that he 'had received information that he [Wilson] would be arriving today from Florida carrying *a lot of drugs.*' (Italics added.)

"Common sense suggests to us that in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer. Before Kaiser made that statement, Wilson might well have thought that the officer was simply pursuing routine, general investigatory activities, and might reasonably have felt free to explain to the officer that he had an important appointment to keep and did not have the time—or, perhaps, the inclination—to answer the officer's questions or to comply with his requests for permission to search. Once the officer advised Wilson that he had information that Wilson was carrying a lot of drugs, the entire complexion of the encounter changed and Wilson could not help but understand that at that point he was the focus of the officer's particularized suspicion. Under these circumstances—and particularly in the absence of any clarifying advice from the officer explaining to Wilson that he was, in fact, free to drive away if he desired—no reasonable person would have believed that he was free to leave. [Citations.]

"Accordingly, we conclude that Wilson was detained, within the meaning of the Fourth Amendment, when he consented to the search of his attache case."

Thus, the *Wilson* court focused on the fact that Detective Kaiser had "advised Wilson that he was conducting a narcotics investigation and that he [Kaiser] 'had received information that he [Wilson] would be arriving today from Florida carrying *a lot of drugs.*'" (*Wilson, supra,* 34 Cal.3d at p. 790; italics original.) The *Wilson* court concluded that "no reasonable person would have believed that he was free to leave," in view of Kaiser's statement, particularly in the absence of any clarifying advice from the officer that Wilson was free to drive away. (*Id.,* at p. 791.)

The instant case is readily distinguishable from *Wilson.* Agent Wood made no statement that he had information that the defendants were carrying drugs. To paraphrase *Wilson* "[i]t is evident that [Agent Wood] did not detain [the defendants] for federal constitutional purposes, merely by ap-

proaching [them], identifying himself as a police officer, and asking if he [Wood] might have a minute of [their] time." (*Wilson, supra,* 34 Cal.3d at p. 790.)

Also of importance here is that the *Wilson* court, in finding that Wilson was detained, particularly noted "the absence of any clarifying advice from the officer explaining to Wilson that he was, in fact, free to drive away if he desired. . . ." (*Wilson, supra,* 34 Cal.3d at p. 791.) In the instant case, Agent Wood, in fact, *did* give comprehensive clarifying advice at the time of the initial contact. Moreover, on three additional occasions Wood advised the defendants that they were free to leave, at least until defendant Profit struck Agent Moore, ran and threw the opened bottle of liquid PCP at Moore.

### The Mendenhall-Wilson Standard: A Broad Overview

It is our duty to apply the *Mendenhall-Wilson* standard to the facts and circumstances of the case at bench. Thus, the issue is: Did Federal Agent Wood, a *"law enforcement officer"* in performance of his official duty of suppressing *"criminal activity"* by interdicting dangerous drugs at the airport, conduct himself in such a manner (from the time of initial contact to the arrest) that *"a reasonable person"* in the defendants' position would have believed that they were not free to leave?

Before analyzing specific facts of the present case in light of authoritative decisional law, we will make some broad observations about law enforcement, drug traffic, and the relevant constitutional guidelines.

"Law Enforcement Officers": *United States* v. *Mendenhall, supra,* 446 U.S. 544, discussed the difference between a "seizure" and an encounter which infringes no constitutionally protected rights. ▮ Quoting *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], the *Mendenhall* opinion states: "'[T]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets,' *id.,* at 34. Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons,' *id.,* at 31, 32-33 (Harlan, J., concurring), although 'ordinarily the person addressed has an equal right to ignore his interrogator and walk away.' *Ibid.* [¶] Similarly, the Court in *Sibron* v. *New York,* 392 U.S. 40, a case decided the same day as *Terry* v. *Ohio,* indicated that not every encounter between a police officer and a citizen is an intrusion requiring an objective justification." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 553 [64 L.Ed.2d 497, 508].)

By contrast, a "seizure" differs markedly from an encounter, and moreover a "seizure" triggers constitutional safeguards. "[A] person is 'seized'

only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 554. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification. [¶] Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes* v. *Washington,* 373 U.S. 503, 515.' *Schneckloth* v. *Bustamonte,* 412 U.S., at 225." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 552-554 [64 L.Ed.2d 497, 508-509].)

 Mr. Justice Powell's concurring opinion also addressed this distinction. "*Terry* v. *Ohio,* 392 U.S. 1 (1968), establishes that a reasonable investigative stop does not offend the Fourth Amendment. [Fn. omitted.] The reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise. [Citations.] [¶] The public has compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement. [¶] To meet this pressing concern, the Drug Enforcement Administration since 1974 has assigned highly skilled agents to the Detroit [and to Los Angeles International] Airport as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed 'drug courier profiles' that describe the characteristics generally associated

with narcotics traffickers. For example, because the Drug Enforcement Administration believes that most drugs enter Detroit from one of four 'source' cities (Los Angeles, San Diego, Miami, or New York), agents pay particular attention to passengers who arrive from those places. [Citations.]" (*United States* v. *Mendenhall, supra*, 446 U.S. 544, 561-562 [64 L.Ed.2d 497, 514].)

Such agents (as in *Mendenhall*) carry out "a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution. [¶] Our cases demonstrate that 'the scope of [a] particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness.' (*Terry* v. *Ohio, supra*, at 18, n. 15.)" (*Id.*, at p. 562 [64 L.Ed.2d at p. 515].)

"In reviewing the factors that led the agents to stop and question the respondent, it is important to recall that a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' *Brown* v. *Texas, supra*, at 52, n. 2. Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices. Law enforcement officers may rely on the 'characteristics of the area,' and the behavior of a suspect who appears to be evading police contact. *United States* v. *Brignoni-Ponce*, 422 U.S., at 884-885. 'In all situations the officer is entitled to assess the facts in light of his experience.' *Id.*, at 885." (*United States* v. *Mendenhall, supra*, 446 U.S. 544, 563-564 [64 L.Ed.2d at 515].)

In making decisions about when a law enforcement decision to stop citizens is "reasonable," Justice Powell suggested use of the following factors. "The public interest in preventing drug traffic is great, and the intrusion upon the respondent's privacy was minimal. The specially trained agents acted pursuant to a well-planned, and effective, federal law enforcement program. They observed respondent engaging in conduct that they reasonably associated with criminal activity. Furthermore, the events occurred in an airport known to be frequented by drug couriers. [Fn. omitted.] In light of all of the circumstances, I would hold that the agents possessed reasonable and articulable suspicion of criminal activity when they stopped the respondent in a public place and asked her for identification. [¶] The jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures. In applying a test of 'reasonableness,' courts need not ignore the considerable expertise that law enforcement officials have gained from their special

training and experience." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 565-566 [64 L.Ed.2d 497, 516-517], Mr. Justice Powell's [separate] opinion, joined by the Chief Justice and Mr. Justice Blackmun concurring in part and concurring in the judgment.)[6]

"A REASONABLE PERSON": "[T]he twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer. . . ." (*United States* v. *Nixon* (1974) 418 U.S. 683, 709 [41 L.Ed.2d 1039, 1064, 94 S.Ct. 3090].)"

"It should always be borne in mind that the constitutional proscription against unreasonable [detention], and the judicial rules promulgated in support thereof, are designed to protect the innocent citizen, not the criminal. It is true, of course, that only the guilty profit *directly* from the exclusionary rule. However, it is assumed that over the long run the law abiding members of society will benefit from that curtailment of excessive police conduct that it is hoped will result from the application of such rule. In essence, the criminal is but an unavoidable 'third party beneficiary' of the compact effected between the governed and their government. [¶] ■ As a consequence, given a situation supplying probable cause to believe a crime is being committed, one measure to be utilized in fixing the parameters of permissible police conduct designed to resolve the question is to be found in the determination of the amount of fear, physical trauma, embarrassment, indignity, etc., to which an innocent person would necessarily be subjected before his innocence could be clarified." (*People* v. *Lara* (1980) 108 Cal.App.3d 237, 241 [166 Cal.Rptr. 475]; *People* v. *Holloway* (1985) 176 Cal.App.3d 150, 156 [221 Cal.Rptr. 394].)

"CRIMINAL ACTIVITY": The "need for swift action" and the "seriousness of the offense" involved are also "highly determinative factor[s] in any evaluation of police conduct. . . ." (*People* v. *Johnson* (1971) 15 Cal.App.3d 936, 940-941 [93 Cal.Rptr. 534].)

■ The "need for swift action" to interdict drug trafficking in an airport setting is apparent in light of the fluid conditions of large crowds

---

[6]Justice Powell's opinion did not reach the government's contention that the DEA agents did not "seize" the defendant within the meaning of the Fourth Amendment. He *assumed* for the purpose of his opinion that the stop did constitute a "seizure" and held—as did the district court—that the federal agents had reasonable suspicion that the defendant was engaging in criminal activity, and, therefore, that they did not violate the Fourth Amendment by stopping the defendant for routine questioning. Mr. Justice Powell's opinion stresses the compelling interest in detecting those who would traffic in deadly drugs which flow through airports, and the necessity that courts in applying the test of "reasonableness" need not ignore the expertise of law enforcement officials gained from special training and experience in stemming that flow.

embarking and deplaning on rapid airline schedules. Every public airport has become a station positioned on the front line in the war against drugs, which can be transported in concentrated form concealed in the luggage or on the persons of travelers. The public interest in interdicting the flow of such toxins into and within our society is "compelling."

The "seriousness of the offense" of trafficking in dangerous drugs is of the highest order. The catastrophic effect of the burgeoning narcotic and dangerous drug epidemic engulfing our society is horrendous—a national disgrace. (See *Killer Drugs—America on Drugs* (July 28, 1986) U.S. News & World Report, pp. 48-54.)

An in-depth study by Dr. Eric D. Wish, a narcotic and drug research scientist, reported to the Subcommittee on Crime, United States House of Representatives, on June 18, 1981, showed some startling statistics on the relationship between drug use and crimes committed to provide money for buying drugs. Of particular significance is the finding in Dr. Wish's study concerning the types and numbers of criminal offenses of which drug users are charged as compared to nonusers. The study showed that drug user arrestees' arrest rates for drug offenses, larcenies, burglaries, and robberies ranged from two to three times those of nonuser arrestees.

Statements by Tom Vischi, an economist with the federal Alcohol, Drug Abuse and Mental Health Administration, and David Hoover, Public Information Officer for the Federal Drug Enforcement Administration, indicate that illegal drug trafficking in the United States is robbing the economy of an estimated $100 billion a year and contributes to inflated consumer prices, unemployment, and higher taxes.

Unquestionably, "[T]he sale of PCP is clearly an extremely dangerous crime which poses a great risk of serious bodily injury to the user, as well as society, even when ingested in extremely small quantities [citations]." (*People* v. *Presley* (1985) 172 Cal.App.3d 1001, 1005 [220 Cal.Rptr. 1].)

In *Presley,* an expert witness testified in the trial court as to the extremely dangerous nature of PCP. The witness stated that "only five milligrams of PCP was required to produce a narcotic effect on the user, and that PCP may store itself in the fat cells of the user's body 'forever.' Consequently, many years following its ingestion, fat cells in the user's body may continue to break off and reintroduce PCP into the blood system, causing intoxication." (*Presley, supra,* at p. 1003.)

According to the expert witness in *Presley,* "if PCP is ingested by a pregnant woman, the drug will attack the brain cells of the fetus, possibly causing brain damage or mutations. The use of PCP is additionally dangerous because PCP inhibits the body's ability to destroy or control dopamine, a chemical naturally found in the body which causes 'suicidal tendencies, violent tendencies . . . low self esteem.' In addition, PCP anesthetizes the body to a point where the user feels 'absolutely zero pain.' A person who uses PCP may thus appear to have 'superhuman strength' because his or her body is immune to pain which would otherwise inhibit activities." (*Presley, supra,* 172 Cal.App.3d at p. 1003; for criminal activities following use of PCP, see also *People* v. *Phillips* (1979) 90 Cal.App.3d 356, 360 [153 Cal.Rptr. 359]; *People* v. *Boyes* (1983) 149 Cal.App.3d 812, 816 [197 Cal.Rptr. 105].)

In *People* v. *Velez* (1985) 175 Cal.App.3d 785 [221 Cal.Rptr. 631], the defendant, after smoking a marijuana cigarette laced with PCP, crashed into a house by kicking open a locked wooden door and viciously attacked with a screwdriver a 64-year-old man watching TV who he didn't even know. He stabbed the victim all over his body, including his eyes. When the police arrived and pointed a gun at the defendant, he continued to try and stab the victim until he was forcefully subdued. As a result of defendant's attack, the victim was partially blinded, his hearing impaired, his legs are stiff and he has no feeling in his left palm. The defendant stated that he smoked marijuana offered to him at a social gathering not knowing that it was impregnated with PCP—that after two puffs, the people in the room began to look like devils. After that, defendant only remembered running and screaming.

PCP ("Angel Dust"), an animal tranquilizer, is a synthetic ("designer") drug and one of the most potent and toxic of all street drugs. It is notorious for causing bizarre and violent behavior in humans. It can lead to convulsions, comas, heart and lung failures, psychotic disorders and schizophrenia and death. "A young man smokes some PCP and proceeds to rob a gas station at gunpoint; a juvenile smokes PCP and rapes his baby sister; a police officer encounters a young man who may have ingested an analog of PCP. The man, naked and unarmed, reportedly becomes combative and assaultive and is shot to death by the officer; two lovers are smoking PCP alone in their bedroom. Within a few minutes one is bleeding to death from a knife wound which may or may not have been self-inflicted; a middle-aged woman takes some cocaine which has been adulterated with PCP and tried to rob a bank armed only with a broom which she manipulates as if it were a gun." (See *Phencyclidine (PCP) Abuse: An Appraisal*—IDA Research Monograph 21 (Aug. 1978) Dept. Health, Ed. & Welf., National

Institute on Drug Abuse, by Robert C. Petersen, Ph.D. and Richard C. Sillman, M.D.)[7]

---

[7]"Users rarely inject liquid PCP. More likely they spray the liquid or sprinkle crystals (Angel Dust) of PCP on plants such as marijuana, tobacco, mint and parsley and smoke it. Reactions to PCP [and bizarre and tragic events which follow] are totally unpredictable. (A 21-year-old Washington, D.C. man stepped out of his shower, climbed naked down the wall of his second-story apartment and started running to New Jersey. The police stopped him several blocks away. A young California girl and her fiance decided to go for a swim. While he was changing, she went into the pool. When her fiance returned, he found her lying dead at the bottom. A 17-year-old New Jersey boy and his girlfriend decided to rob a nearby summer home at the seashore. Instead, the youth chose to bludgeon to death the elderly woman who lived in the cottage. He awoke the next morning covered with blood, and with no recollection of his brutal act).

"Dr. Beatrice Kresky of New York's Jamaica Hospital [says 'bad trips'] can make Grimm's fairy-tale characters come to life. Parents, nurses, and doctors appear as monsters or witches, and police cars take on the form of dragons.

"Psychotic reactions to PCP mimic the symptoms of paranoid schizophrenia, with hallucinatory voices and combative or self-destructive impulses. The drug can also give users a distorted sense of their own bodies; people often feel their arms or legs are growing or shriveling. Users may also suffer loss of bowel or bladder control, slurred speech, inability to walk, jerky eye movements and grimacing. Acute toxic reactions can last up to a week after a single dose, and the mental effects can linger for more than a month, often recurring in sudden episodes while the patient is apparently recovering. Taken in larger doses, PCP can induce seizures, coma and death." (*The Deadly 'Angel Dust,'* Newsweek (Mar. 13, 1978) by Matt Clark and Susan Agrest.)

An article entitled *Phencyclidine Abuse and Crime: A Psychiatric Perspective* by Beverly J. Fauman, M.D. and Michael A. Fauman, Ph.D., M.D., in the Bulletin of the American Academy of Psychiatry and the Law (AAPL) volume 10, No. 3, 1982, pages 171-176, explains the nature and effects of PCP on a user. The article contains the following statements: "Phencyclidine is not a hallucinogen nor a psychedelic but rather is described as a dissociative anesthetic. It appears to short-circuit the ability to interpret ordinary external proprioceptive stimuli accurately. To observers, the user may appear blind or drunk because he cannot negotiate an easy hallway or sidewalk. Users describe feeling like they are 'walking on clouds.'

"Tragically, they may drown in shallow pools because they literally cannot figure out which way is up . . .

"During the past decade, dramatic crimes, deaths, and the extensive illegal sale of PCP have led to progressively stiffer federal regulations . . .

"The defendant in a crime of violence in which PCP is implicated often claims to have no memory of the crime. The defendant may be upset or appalled by the crime but, not uncommonly, seems to have no affect about it. Often the victim was a friend or an acquaintance, and the defendant has no history of violent behavior. He or she may be described by friends as passive, non-violent, or quiet.

"In certain types of injuries and crimes—the behavior is often stereotyped, resulting in multiple injuries. If the victim is murdered, the murder seems particularly bizarre or brutal. The instrument is often what was at hand, rather than a more standard weapon—hammers and ice picks, rather than guns or knives. The defendant not infrequently sustains injuries, which are sometimes self-inflicted. From witnesses or from the defendant, no obvious confrontation or secondary gain can be determined. The crime does not appear to have a motive."

The article reported on one case study as follows:

"A 25-year-old skilled laborer had used PCP for six years. During a holiday weekend he injected approximately 2.5 g of PCP while also drinking beer and wine. Four days later, he stabbed his close friend in the arm, with no provocation, and chased him out of the house. His friend summoned the police, who found the friend's pregnant fiancee lying naked and

The Case at Bench

Having distinguished the case of *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777, and discussed generally some broad factors which may be considered in determining whether or not the defendants herein were "detained," we turn now to the specific facts and circumstances in the case at bench.

Instructive here for comparison and analysis are the three United States Supreme Court cases of *United States* v. *Mendenhall, supra,* 446 U.S. 544; *Reid* v. *Georgia* (1980) 448 U.S. 438 [65 L.Ed.2d 890, 100 S.Ct. 2752]; *Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319] and the California State Supreme Court case of *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777.

*United States* v. *Mendenhall, supra,* 446 U.S. 544[8] throws light on the distinction between a "consensual encounter" and "detention." Relevant here is the following language from the lead opinion by Mr. Justice Stewart, joined by Mr. Justice Rehnquist:

" '[O]bviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of

dead on the floor with multiple stab wounds of the head, neck, and body. Mr. D lay a few feet away from her, stuporous, with multiple wounds (presumably self-inflicted) including deep lacerations of the neck and a deep penetrating stab wound of the abdomen. Pieces of human tissue were seen smeared on the wall."

[8]In *Mendenhall, supra,* 446 U.S. 544, the defendant who arrived at the Detroit Metropolitan Airport on a flight from Los Angeles was initially approached and questioned by two Drug Enforcement Administration (DEA) agents and subsequently was arrested for possessing heroin. The district court denied the defense motion to suppress, concluding (a) that the DEA agents' conduct in initially approaching the defendant and asking to see her ticket and identification was a permissible investigative stop, based on facts justifying a suspicion of criminal activity, and (b) that the defendant had accompanied the agents to the DEA office voluntarily and voluntarily consented to a body search in the DEA office. Defendant Mendenhall's subsequent conviction after a trial was reversed by the Court of Appeals which found that the defendant had not validly consented to the search.

The United States Supreme Court in *Mendenhall* reversed the judgment of the court of appeals and concluded that the district court's determination that defendant Mendenhall consented to the search of her person "freely and voluntarily" was sustained by the evidence.

In *Mendenhall, supra,* the detention issue had not been litigated in the lower courts, apparently because the prosecution had never contended that the officers' conduct fell short of a detention. Therefore, seven judges of the Supreme Court resolved the case on the assumption that a detention had occurred. Of the seven, three—Justices Powell, Blackmun and the Chief Justice—found that there was sufficient articulable suspicion to justify a detention, and four—Justices White, Brennan, Marshall and Stevens—found that there was not. The two remaining judges—Justices Stewart and Rehnquist—concluded that the detention issue was not foreclosed despite the prosecution's failure to pursue it, and—without deciding the reasonable suspicion question—resolved the case in favor of the prosecution on the ground that no detention had occurred. As a result, the conviction in *Mendenhall* was affirmed by a five-to-four margin.

physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' *Terry* v. *Ohio,* 392 U.S., at 19, n. 16." (446 U.S. at pp. 551-552 [64 L.Ed.2d at pp. 507-508].)

■ "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. [Fn. omitted.] Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. [¶] On the facts of this case, no 'seizure' of the respondent occurred. The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official. [Citations.] In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure. [¶] Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed. See *Schneckloth* v. *Bustamonte, supra.* We also reject the argument that the only inference to be drawn from that fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." (446 U.S. at pp. 554-556 [64 L.Ed.2d at pp. 509-510].)[9]

---

[9]The *Mendenhall* court further observed: "The distinction between an intrusion amounting to a 'seizure' of the person and an encounter that intrudes upon no constitutionally protected

The case of *Reid* v. *Georgia, supra,* 448 U.S. 438, as noted by the *Wilson* court, does not assist in distinguishing "consensual encounters" from "detention" because it did not decide whether or not the initial contact fell into the category of a "consensual encounter."[10]

---

interest is illustrated by the facts of *Terry* v. *Ohio,* which the Court recounted as follows: 'Officer McFadden approached the three men, identified himself as a police officer and asked for their names. . . . When the men "mumbled something" in response to his inquiries, Officer McFadden grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between McFadden and the others, and patted down the outside of his clothing.' *Id.,* at 6-7. Obviously the officer 'seized' Terry and subjected him to a 'search' when he took hold of him, spun him around, and patted down the outer surfaces of his clothing, *id.,* at 19. What was not determined in that case, however, was that a seizure had taken place before the officer physically restrained Terry for purposes of searching his person for weapons. The Court 'assume[d] that up to that point no intrusion upon constitutionally protected rights had occurred.' *Id.,* at 19, n. 16." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 552-553 [64 L.Ed.2d 497, 508].)

[10]In *Reid,* cocaine was found in a bag the defendant had abandoned at the Atlanta Airport when he started to run away, after a federal narcotics agent asked him for identification and after he had consented to a search of his person and shoulder bag. The Georgia trial court granted the defendant's motion to suppress.

The Georgia Court of Appeals reversed, holding that the stop of the defendant was permissible since he appeared to the agent to fit the so-called "drug courier profile."

The Georgia Court of Appeal, relying on the agent's testimony that the defendant appeared to fit the airport's "drug courier profile" in a number of respects, held that the officer had "reasonable suspicion" to approach and detain the two men outside the terminal building. Specifically, the Georgia court found it relevant that "(1) the [defendant] had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the [defendant] arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags." (*Reid* v. *Georgia, supra,* 448 U.S. 438, at p. 441 [65 L.Ed.2d 890, at p. 894].)

The United States Supreme Court, in granting certiorari in a short *per curiam*-type opinion in *Reid,* held that as a matter of law, the narcotics agent could not have reasonably suspected the defendant of criminal activity on the basis of the observed circumstances to justify a "seizure" and therefore the appellate court's judgment could not be sustained. Mr. Justice Rehnquist dissented for the reasons stated by Mr. Justice Stewart in *Mendenhall* concluding that the police conduct involved did not implicate the Fourteenth or Fourth Amendment rights of the petitioners in that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 554 [64 L.Ed.2d 497, 509].)

Mr. Justice Powell in his concurring opinion in *Reid,* joined by the Chief Justice and Mr. Justice Blackmun, pointed out that in their concurring opinion in *Mendenhall* they did not consider the seizure issue because it had not been raised in the courts below. He also stated that in any event, not reaching that issue in *Mendenhall,* "did not necessarily indicate disagreement with the views of Mr. Justice Stewart and Mr. Justice Rehnquist." (*Reid* v. *Georgia, supra,* 448 U.S. 438, 443 [65 L.Ed.2d 890, 895].) Mr. Justice Powell concluded by stating: "The state courts, which decided this case before our decision in *Mendenhall,* did not consider whether the petitioner had been seized. Rather, those courts apparently assumed that the stop for routine identification questioning constituted a seizure, and addressed only the question whether the agent's actions were justified by articulable and reasonable grounds of suspicion. Because we similarly do not consider the initial seizure question in our decision today, that issue remains open for consideration by the state courts in light of the opinions in *Mendenhall.*" (*Ibid.*)

While the opinion of *Florida* v. *Royer, supra,* 460 U.S. 491,[11] turned on the distinction between a "detention" and an "arrest," it discusses some typical police actions that fall into the "consensual encounter" category.

The *Royer* court at pages 497-498 [75 L.Ed.2d at p. 236] said: "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momen-

---

[11]In *Florida* v. *Royer,* two undercover narcotic agents working at the Miami airport testified that they first took note of Royer because they believed that his "appearance, mannerisms, luggage and actions fit the so-called 'drug courier profile.'" (460 U.S. 491, at p. 493 [75 L.Ed.2d 229, 233].) As they observed him, Royer purchased a one-way ticket to New York and checked his two suitcases, placing on each an identification tag with the name "Holt." As he walked along the concourse toward the airline boarding area, the two officers approached him, identified themselves as policemen working out of the sheriff's office, and asked him if he had a "moment" to speak with them. He said, "Yes."

At the officer's request, Royer produced his airline ticket and driver's license; the ticket—like the baggage identification tags—was made out in the name "Holt," while the driver's license carried his correct name, "Royer," when the officer asked about the discrepancy, Royer stated that a friend had made the reservation in the name "Holt." During this conversation, Royer became noticeably more nervous, and the officers then informed him "that they were in fact narcotics investigators and that they had reason to suspect him of transporting narcotics." (460 U.S. at p. 494 [75 L.Ed.2d at p. 234].) At that point the officers, who still had Royer's airline ticket and identification, asked him to accompany them to a room adjacent to the concourse, about 40 feet away.

Without saying anything, Royer walked with the officers to the small room—described as a "large storage closet"—which contained a desk and two chairs. Without seeking Royer's consent, one of the officer's retrieved the luggage which Royer had checked and brought it to the room. Royer was then asked if he would consent to a search of the suitcase. In response, Royer produced a key and unlocked one suitcase; an officer opened it and found a substantial quantity of marijuana. Royer then consented to the search of the second bag, in which, too, marijuana was found. The entire episode—from the time the officers first approached Royer to their discovery of the contraband—took about 15 minutes.

Before trial, Royer moved to suppress the evidence on Fourth Amendment grounds, the motion was denied and he was convicted of felony marijuana possession. On appeal, the Florida Court of Appeal reversed the conviction, holding (1) that the police did not even have sufficient information to constitute the articulable suspicion required to justify a limited detention and (2) that, in any event, the police conduct which preceded the consent exceeded the limited restraint permitted in a detention context. The state then appealed that decision to the United States Supreme Court.

In its decision in *Royer,* the high court disagreed with the Florida court on the "articulable suspicion" issue but upheld the reversal of the conviction on the ground that the police had indeed exceeded the bounds of a limited detention—that, before he had consented to the search of his luggage, "[a]s a practical matter, Royer was under arrest." (460 U.S. at p. 503 [75 L.Ed.2d at p. 240].)

tarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.''

Returning to the instant case, it is obvious that Agent Wood was carefully schooled in such cases as *Mendenhall, Royer* and *Wilson.* The facts show that Wood scrupulously observed the guidelines discussed in those cases.

Agent Wood did *not* engage in conduct which the *Mendenhall* opinion said might indicate a seizure even where the person did not attempt to leave, such as a threatening presence of several officers. (Here initially there were three defendants and only two officers. Only later did the third officer even the numbers. This does not constitute a show of force, but instead indicates a reasonable exercise of precaution for the officers' own safety. Wood also testified he did not want to leave Moore, an agent new to airport work, alone in the concourse); nor was there a display of weapons or evidence of the use of language or tone of voice indicating that compliance with the officers' request might be compelled.

Agent Wood's conduct conformed to reasonable conduct described in *Royer,* which would fall short of a detention. He merely approached the defendant, identified himself, and asked them if they were willing to talk with him.

Significantly, in *Royer* the officer retained Royer's airline ticket and iden-tification and asked him to accompany him to an adjacent room. In the case at bench, by contrast, Agent Wood did not take possession of Profit's briefcase or the three airline tickets. Moreover, it was Profit and the others who volunteered to go to the DEA office and continue the conversation because of Profit's embarrassment over the discrepancy in the name on his airline ticket and the ticket observed by Wood in the opened briefcase.

Even of greater significance here is that not only did Agent Wood conform to the judicially declared "Do's and Don't's" of investigative contacts, but he also gave all three defendants clarifying advisements of their Fourth Amendment rights.

No binding authority has established a rule requiring an explicit warning for a consensual detention to occur (*People* v. *Spicer* (1984) 157 Cal.App.3d 213, 220 [203 Cal.Rptr. 599]). Nonetheless, the delivery of such a warning weighs heavily in favor of finding voluntariness and consent. (*People* v. *James* (1977) 19 Cal.3d 99, 118 [137 Cal.Rptr. 447, 561 P.2d

1135]; *United States* v. *Mendenhall, supra,* 446 U.S. 544, 558-559 [64 L.Ed.2d 497, 512].)[12]

██ In the case at bench the record reveals that Agent Wood informed the defendants four times of their right not to talk with him and that they were free to leave. ██ Knowledge of the right to refuse is "highly relevant to the determination that there had been consent." (*United States* v. *Mendenhall, supra,* 446 U.S. 544, 559 [64 L.Ed.2d 497, 512].) ██ "[P]erhaps more important for the present purposes, the fact that *the officers themselves* informed the [defendant] that [he] was free to withhold [his] consent substantially lessened the probability that their conduct could reasonably have appeared to [him] to be coercive." (*Id.,* at p. 559 [64 L.Ed.2d at p. 512]; italics added.)

The facts and circumstances in the case of *United States* v. *Beale* (9th Cir. 1982) 674 F.2d 1327, certiorari denied, judgment vacated, and case remanded for further consideration in light of *United States* v. *Place* (1983) 462 U.S. 696 [77 L.Ed.2d 110, 103 S.Ct. 2637], *United States* v. *Beale* (1983) 463 U.S. 1202 [77 L.Ed.2d 1382, 103 S.Ct. 3529] are reasonably analogous to those in the case at bench.

*Beale* involved an initial contact by a police officer with defendant Beale and a male companion at an airport in Fort Lauderdale, Florida, which culminated in Beale's apprehension and conviction of possession with intent to distribute and conspiracy to possess with intent to distribute cocaine (in violation of 21 U.S.C. §§ 841(a)(1), 846) in San Diego. The issues presented were the constitutional propriety of police encounters with defendant Beale in the Fort Lauderdale Airport, the use of a trained canine "Nick" to sniff Beale's luggage in the baggage room in Fort Lauderdale, and his ultimate arrest and the search of baggage in San Diego.

The *Beale* court held that the initial encounter by the police in Fort Lauderdale was not a seizure or detention under the Fourth Amendment.

---

[12]When someone has been arrested or makes a guilty plea at trial, the Constitution requires the state to inform the citizen of his rights. Those rights are so important that unless they are explicitly and timely recited, an individual in custody or pleading guilty cannot be considered capable of exercising knowledgeably the freedom of choice upon which those rights are predicated, and which they exist to preserve.

The right to be free from momentary detention by police is less important than, for instance, the two rights we have just referred to. (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 665-666 [74 Cal.Rptr. 423].) Therefore, as we have indicated, the law requires no such explicit warning from police for consensual detention to occur, given the presence of other factors. A warning is not a sine qua non of consensual detention. Neither is knowledge of the right to refuse essential to effective consent. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 234 [36 L.Ed.2d 854, 867, 93 S.Ct. 2041].) Such an advisement nonetheless weighs heavily in favor of such consensuality.

Obviously, the more consent is informed, the more likely it is to be voluntary.

There a detective of the county sheriff's department assigned to the Fort Lauderdale Airport detail suspicious of Beale's behavior approached Beale and a male companion, identified himself, explained that they were not under arrest, and requested that they answer a few questions and produce identification.

The court stated at pages 1329-1330: "Beale contends that the officer's initial approach and non-custodial questioning of him and his companion constituted a 'seizure' or detention under the Fourth Amendment, requiring founded suspicion or probable cause. The District Court, however, concluded otherwise [fn. omitted] and we agree. The suspects' mobility was not impaired; the situation was non-coercive; Berks did not request that they follow him or otherwise alter their destination, schedule, or location; the questions were routine and brief, and in an atmosphere not dominated by law enforcement personnel; and the suspects agreed to answer Berks' queries 'in a spirit of apparent cooperation.' *See Sibron* v. *New York*, 392 U.S. 40, 63; *United States* v. *Fry*, 662 F.2d 1218, 1219-21 (5th Cir. 1980) (per curiam); *United States* v. *Elmore*, 595 F.2d 1036, 1041-42 (5th Cir. 1979), *cert. denied*, 447 U.S. 910; 3 W. La Fave, Search and Seizure: A Treatise on the Fourth Amendment 48-55 (1978). [¶] Thus, we need not consider whether 'founded' or 'articulable' suspicion existed at that time. *Cf. United States* v. *Mendenhall*, 446 U.S. 544; *Brown* v. *Texas*, 443 U.S. 47; *Adams* v. *Williams*, 407 U.S. 143; *Terry* v. *Ohio*, 392 U.S. 1; *United States* v. *Corbin*, 662 F.2d 1066, 1068-71 (4th Cir. 1981.)"[13] (Fn. omitted and unofficial citations.)

In sum, Agent Wood's course of conduct, in performance of his official duties, fully complied with the applicable legal requirements of relevant case law. The events took place in a public area and the officers were in civilian clothes; there was no putting on of hands or touching (as in *Terry*); no display of weapons or show of force; no demands or orders (as in *Terry*)—only permissible investigative questions and requests; no retention of Profit's briefcase, luggage or the three airline tickets (as in *Royer*); and no statement (as in *Wilson*) that would lead the defendants to believe that they were not free to leave. In addition, Agent Wood affirmatively advised the defendants on four occasions that they did not have to speak to him and were free to leave.

---

[13]The three-member panel of the *Beale* court vacated the defendant's conviction on the ground that "the use of a canine's keen sense of smell to detect the presence of contraband in personal luggage is a Fourth Amendment intrusion, albeit [*sic*] a limited one that may be conducted without a warrant and which may be based on an officer's 'founded' or 'articulable' suspicion rather than 'probable cause.'" The case was remanded to the district court for a factual or legal determination with regard to the Fort Lauderdale quantum of suspicion.

Accordingly, it is our independent judgment that the officers' conduct was not such that "a reasonable person in [defendants'] position would have believed that [they] were not free to leave." The defendants were *not* detained. We hold, as a matter of law, that the interaction between the officers and the defendants up to the time they were arrested fall into the category of a "consensual encounter."

## II.

*Did Agent Wood have probable cause to arrest defendants Dawkins and Manuel without a warrant?* YES.

On a section 995 motion to set aside an information, the question of the guilt or innocence of a defendant is *not* before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. Here, our function is to determine from all the facts and circumstances if Agent Wood had probable cause to arrest Dawkins and Manuel. Every legitimate inference that may be drawn from the evidence in Agent Wood's testimony must be drawn in favor of the information. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]; *People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].)

The Fourth Amendment to the United States Constitution provides in pertinent part "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated. . . ." (Italics added.) Thus, the term "probable cause" means "reasonable cause" to arrest.

The courts, in pursuit of "ordered liberty," have sought to strike a balance between the necessity for order and the necessity for individual liberty in addressing Fourth Amendment rights. As a result of this balancing effort, Justice Macklin Fleming of the California Court of Appeal (retired), in his book Of Crimes and Rights (W.W. Norton & Co., Inc. 1978), observed that: "[O]ur preoccupation with restrictions on police activity has become so great that an impression circulates that the chief end of criminal law is to prevent invasions by police rather than invasions by criminals. Unquestionably, this preoccupation has led to the release of patently guilty criminals and thereby weakened the deterrent effect of criminal law. . . ."

Chief Justice Weintraub of the State of New Jersey in *State* v. *Bisaccia* (1971) 58 N.J. 586, 590 [279 A.2d 675, 677] stated "The first right of the individual [and society] is to be protected from attack. That is why we have government, as the preamble to the Federal Constitution plainly says. In

the words of *Chicago v. Sturges*, 222 U.S. 313, 322, 32 S.Ct. 92, 93; 56 L.Ed. 215, 220 (1911): 'Primarily, governments exist for the maintenance of social order. Hence it is that the obligation of the government to protect life, liberty, and the property against the conduct of the indifferent, the careless, and the evil-minded, may be regarded as lying at the very foundation of the social compact.' [¶] The Bill of Rights [including the Fourth Amendment] was not intended to deny that primary mission. That is not to belittle the inestimable rights thus consecrated, but rather to say that those rights may not be read to defeat the very reason for government itself."

Mr. Justice Blackmun of the United States Supreme Court last month opined, "I feel, however, that at times this court tends to be overly concerned with theory and pronounced principles for their own sake, and to disregard the significant realities that so often characterize a criminal case. There is a real world as well as a theoretical one." (See *Lee* v. *Illinois* (1986) 476 U.S. 530, — [90 L.Ed.2d 514, 530, 106 S.Ct. 2056] (dis. opn. Blackmun, J., jt. dis. opn. Powell, J., Burger, C. J., and Rehnquist, J.))

We must dispel the "impression [that] circulates," referred to by Justice Macklin Fleming, and address the "significant realities" in the "real world" referred to by Mr. Justice Blackmun. The facts and circumstances in forming a decision to arrest with probable cause encompass the "total atmosphere" of the case. (See *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Poole* (1975) 48 Cal.App.3d 881, 887-889 [122 Cal.Rptr. 87].)

 In determining whether Agent Wood had reasonable cause to arrest Dawkins and Manuel, the "total atmosphere of the case" includes not only considering all of the facts and circumstances known to him at the time he acted, but also his special training, experience and expertise in detecting those trafficking in deadly drugs in an airport setting (a place known to be frequented by drug couriers), as well as the "seriousness of the offense," which is a highly determinative factor in evaluating police conduct.

Agent Wood testified that based upon his experience and knowledge he formed the opinion that the liquid in the bottle Profit threw at Moore was PCP. He testified that he based his decision to arrest Dawkins and Manuel on the circumstances up to the moment Profit threw the bottle and fled. ██ Those circumstances led him to conclude that all three defendants had been engaged in an ongoing conspiracy to transport PCP via American Airlines to Texas.[14]

---

[14]We note that Agent Wood is a federal narcotics agent with the DEA assigned to Los Angeles International Airport. We further note that in *United States* v. *Beale, supra,* 674 F.2d 1327, the defendant was charged in the federal court under violation for conspiracy. The fact that the defendants were charged in California courts under California law does not affect the legality of Federal Agent Wood's arrest of Dawkins and Manuel for conspiracy under federal law provided there was reasonable cause to arrest for conspiracy.

In brief, conspiracy requires an agreement between two or more persons with the specific intent to agree and to commit an offense, followed by an overt act committed by *one* or more of the parties for the purpose of accomplishing the object of the agreement. An "overt act" means any step taken or act committed by *one* or more of the conspirators which goes beyond mere planning or agreement to accomplish the conspiracy's object. The step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the conspiracy's ultimate object. Nor is it required that such step or act, in and of itself, be a criminal or an unlawful act.

Nor is it necessary in proving a conspiracy to show a meeting or express agreement of the alleged conspirators. The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and proved by both direct and circumstantial evidence. (*People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427].) Evidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that such person was a member of the alleged conspiracy. (*People* v. *Hardeman* (1966) 244 Cal.App.2d 1, 41 [53 Cal.Rptr. 168], cert. den. *Hardeman* v. *California* (1967) 387 U.S. 912 [18 L.Ed.2d 634, 87 S.Ct. 1700]; *People* v. *Toledo-Corro* (1959) 174 Cal.App.2d 812, 820 [345 P.2d 529].)

Here, there is much more than a mere association of the three defendants, which suffices to constitute reasonable cause to arrest Dawkins and Manuel for conspiracy. When Profit struck Agent Moore, ran and threw at him an opened bottle containing a liquid which emitted a strong odor of ether, Agent Wood, a highly trained DEA officer, formed the opinion that the liquid was PCP. The fact that Profit attempted to board the plane for Dallas with the bottle in his possession constituted an "overt act" in accomplishment of the conspiracy's objective.

Other circumstances which would lead Agent Wood to form a strong suspicion that the three were engaged in a conspiracy include Agent Wood's observation of the extreme nervousness of all three at the ticket counter and in the boarding area; the small amount of luggage; Dawkins's attempt to disassociate himself from the other two defendants when Wood approached Profit and Manuel in the boarding area; the yellow pad in Profit's briefcase, which Agent Wood believed to be a narcotics sales ledger; Profit saying, "Here are *our* tickets" (italics added); and the disparity between the name on Profit's airline ticket and the name on the ticket in the briefcase, which in turn created a conflict about how long they had been in Los Angeles. These specific factors in combination would lead

a person of ordinary care and prudence to believe or entertain a strong suspicion that defendants Dawkins and Manuel were engaged in conspiracy with Profit to transport an illegal substance (PCP) across state lines.[15]

But here there is even more. The "total atmosphere of this case" includes the fact that Agent Wood had 16 years of training, experience and expertise in the investigation of controlled substances with the DEA, including about 100 cases of possession for sale of PCP. Common sense dictates that this fact cannot be ignored in assessing Wood's judgment as to the presence or absence of probable cause to arrest. The DEA has undoubtedly expended millions of dollars of public funds training special federal agents to stop the flow of dangerous drugs through our national airports. To ignore the expertise of these agents in determining probable cause would show a lack of will to bring the drug epidemic under control.

As Mr. Justice Powell stated in his opinion in *United States* v. *Mendenhall, supra,* 446 U.S. 544, 565-566 [64 L.Ed.2d 497, 517], "The jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures. In applying a test of 'reasonableness,' courts need not ignore the considerable expertise that law enforcement officials have gained from their special training and experience." (See also *Brown* v. *Texas* (1979) 443 U.S. 47, 52, fn. 2 [61 L.Ed.2d 357, 362, 99 S.Ct. 2637], *People* v. *Aldridge, supra,* 35 Cal.3d 473, 477, and the discussion in this opinion, *ante,* on the *Mendenhall-Wilson* Standard: A Broad Overview; Law Enforcement Officers.)

Nor can we ignore the "seriousness of the offense" involved, which is a "highly determinative factor in any evaluation of police conduct." (*People* v. *Johnson, supra,* 15 Cal.App.3d 936, 940-941.) The reality is that this country has a monumental drug problem. We are at war with drug traffickers. PCP is one of the most toxic and deadly designer drugs. In fact, the public demands a major effort by all elements of the criminal justice system to stop drug trafficking. This effort must include a more flexible response by courts in reviewing police determinations of probable cause. (See the *Mendenhall-Wilson* Standard: A Broad Overview; Criminal Activity, *ante,* and

---

[15]"'The constitutional precept of "reasonableness" as to [arrests] searches and seizures is not a "fact" which can be "found" or not found in any given case. Rather, it is [a] standard, a rule of law, external, objective and ubiquitous, to be applied to the facts of all cases. [Citations.]' Reasonable cause to make an arrest without a warrant must be tested by the facts known to the officer at the time he is required to act [citations]; and he must be able to point to 'specific and articulable facts' and circumstances (*Cunha* v. *Superior Court* [(1970)] 2 Cal.3d 352, 356 [85 Cal.Rptr. 160, 466 P.2d 704]) which would lead a man of ordinary care and prudence to believe, or entertain a strong suspicion, that the person arrested is guilty of a felony. [Citations.]" (*People* v. *Poole, supra,* 48 Cal.App.3d 881, 887.)

Chief Justice Burger's parable of the Tiger and the Mouse in his dissent to *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 419 [29 L.Ed.2d 619, 640].)[16]

All of the factors hereinbefore discussed comprise the "total atmosphere of the case" (*People* v. *Ingle, supra,* 53 Cal.2d 407, 412; *People* v. *Poole, supra,* 48 Cal.App.3d 881, 888) which would lead Agent Wood to entertain a strong suspicion that Dawkins and Manuel were guilty of engaging in a conspiracy with Profit to transport PCP via American Airlines to the State of Texas. Dawkins's and Manuel's Fourth Amendment rights were not violated, there was probable cause to arrest.

#### DISPOSITION

The judgment (order) appealed from is reversed. The case is remanded to the superior court with directions to vacate its order dismissing the information and enter a new and different order denying the defendants' section 995 motion, reinstating the charges against all three defendants.

Spencer, P. J., and Devich, J., concurred.

---

[16]"Freeing either a tiger or a mouse in a schoolroom is an illegal act, but no rational person would suggest that these two acts should be punished in the same way. From time to time judges have occasion to pass on regulations governing police procedures. I wonder what would be the judicial response to a police order authorizing 'shoot to kill' with respect to every fugitive. It is easy to predict our collective wrath and outrage. We, in common with all rational minds, would say that the police response must relate to the gravity and need; that a 'shoot' order might conceivably be tolerable to prevent the escape of a convicted killer but surely not for a car thief, a pickpocket or a shoplifter. [¶] I submit that society has at least as much right to expect rationally graded responses from judges in place of the universal 'capital punishment' we inflict on all evidence when police error is shown in its acquisition."

**DEVICH, J.,** Concurring.—I concur in the judgment reversing the trial court's order granting the defendants' motion to set aside the information pursuant to Penal Code section 995.

In addition, I feel it is important to discuss why the case at bench does not fall within the ambit of another Los Angeles International Airport narcotics case, *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423 [82 Cal.Rptr. 484, 462 P.2d 12], overruled on other grounds in *In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957]. In fact, had the factors of the case at bench been present in the *Irwin* case, I believe our Supreme Court would have arrived at a different result.

In *Irwin,* the police were summoned when an airline employee discovered marijuana in a passenger's baggage. The police arrested Cauwels when he claimed the baggage. One of the police officers observed Irwin "just standing" in the lobby next to two pieces of luggage and a paper bag. One of the pieces of luggage had a tag attached to it bearing the next sequential number to the tag attached to Cauwels' baggage.

After being told by Irwin that he had no baggage, the police officer examined the baggage. When he picked up the paper bag, the officer detected an odor similar to the odor emanating from Cauwels' baggage. The officer then searched through the baggage and discovered marijuana.

In ordering the evidence suppressed, our Supreme Court stated: "'[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . .' [¶] Thus, a detention based on 'mere hunch' is unlawful [citation], even though the officer may have acted in good faith [citation]. 'There must be a "rational" suspicion by the peace officer that some activity out of the ordinary is or has taken place . . . some indication to connect the person under suspicion with the unusual activity. . . . [and] some suggestion that the activity is related to crime.' [Citation.] . . . [¶] Although the discovery that Cauwels had shipped a box of marijuana showed criminal activity, there is nothing unusual in the activity of Irwin who was standing close to baggage near the United Airlines baggage area in the Los Angeles International Airport. The basis of Officer Simmons' initial decision to see if Cauwels was accompanied by anyone else does not appear in the record; we can assume only that he had a 'hunch' that marijuana shippers might be traveling in pairs. [¶] . . . [T]here is nothing in Irwin's activity to distinguish him from any other embarking or debarking passenger at the Los Angeles airport. [¶] Nor does the circumstance that one of the pieces of luggage near where Irwin was standing contained the next-numbered tag to Cauwels' baggage tag rationally suggest criminal activity by Irwin, or

provide a rational connection to Cauwels' criminal activity." (*Irwin v. Superior Court, supra,* 1 Cal.3d at pp. 426-427.)

Since the only factor the police officers had to connect Irwin to the contraband and to Cauwels was that Irwin was "standing close" to baggage that contained the next-numbered tag to Cauwels' baggage, the California Supreme Court correctly granted a peremptory writ of mandate directing the superior court to suppress the evidence consisting of the paper bag and its contents. The officers had no knowledge that Irwin was even with Cauwels. Surely, as noted in *Irwin,* it is reasonable to assume "that Irwin was the next passenger in line at the baggage check-in counter." (*Id.,* at p. 427.) There was nothing to show any criminal activity on the part of Irwin.

The basic fundamental constitutional principles set forth in *Irwin* have been established through case law and are not subject to dispute. However, in the case at bench, other circumstances were present and known to the experienced federal agent that were not available to the officers in *Irwin.*

Agent Wood knew that Profit, Dawkins, and Manuel were together as he had observed them enter the ticket counter area where Profit paid cash for three airline tickets. Conversely, in *Irwin,* the sole link between Cauwels (a person known to be carrying contraband) and Irwin was that Irwin was standing near baggage containing the next-numbered tag to the box containing contraband.

Also, Agent Wood testified that he had observed what he felt to be "extremely nervous activity" on the part of Dawkins and Manuel. Additionally, two crucial factors to be considered are the substantial background possessed by Agent Wood and the purpose for which he was specifically assigned to the airport detail, i.e., to work on drug enforcement. Compare this to *Irwin* where the court was dealing with two patrol officers who performed diligently under the circumstances of that case but who apparently did not have Agent Wood's vast drug investigation experience.

In assessing probable cause to arrest, judges should not ignore an officer's experience. Professionals develop a "sixth sense," over the years, as to how to handle a given situation and what to look for in arriving at a successful result. For example, with experience, doctors, lawyers, laborers, and businessmen all acquire instincts which enable them to perform their jobs in more productive ways than when they first started their careers. It is no different with federal agents such as Agent Wood. His instinct as to what he was observing was more than just a "mere hunch." He knew something was not in order. In Agent Wood's professional opinion, Profit, Dawkins, and Manuel were acting in a manner uncharacteristic of the usual passenger.

This is in direct contravention to *Irwin* where "there [was] nothing in Irwin's activity to distinguish him from any other embarking or debarking passenger at the Los Angeles Airport." (*Irwin* v. *Superior Court, supra,* 1 Cal.3d at p. 427.)

As noted by our Supreme Court, "experienced police officers develop an ability to perceive the unusual and suspicious, and we recognize the right and duty of officers to make reasonable investigation of such activities. [Citations.]" (*People* v. *Aldridge* (1984) 35 Cal.3d 473, 477 [198 Cal.Rptr. 538, 674 P.2d 240].)

The intuition of an experienced officer, while not enough in and of itself to justify an arrest, is certainly an important factor to be considered in analyzing whether probable cause existed.

Agent Wood knew that the defendants were together, that they were nervous, that they made a half-hearted attempt to separate, and that they said they had no identification. After receiving permission to look into Profit's briefcase, Agent Wood saw what he believed to be a narcotics sales ledger sheet and an airline ticket in a different name from the tickets previously shown to him. This was followed by Profit's statement regarding possible marijuana possession. A major factor then arose. Profit suddenly struck another federal agent (Moore) while Dawkins and Manuel stood there. Profit then fled while throwing a bottle at Moore containing a liquid that smelled very strongly of ether.

At that point, legitimately forming the opinion that the liquid was phencyclidine (PCP) and illegal to possess, the agents had sufficient cause to arrest Profit. In addition, based upon the knowledge they had, it was reasonable for them to believe that Dawkins and Manuel were likewise involved in criminal activity, i.e., a conspiracy to transport PCP.

As noted in *Irwin* v. *Superior Court, supra,* 1 Cal.3d at p. 426, "although 'a police officer . . . may detain and question a person when the circumstances are such as would indicate to a reasonable man in a like position that such a course is necessary to the proper discharge of [his] duties,' the circumstances must be such as to distinguish the activity of the detained person from that of any other citizen and must be based on an objective perception of events rather than the subjective feelings of the detaining officers. (See also, *People* v. *Moore* [(1968)] 69 Cal.2d 674, 683 . . . .) [¶] '[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . .'"

Here, Agent Wood was able to completely point out to the magistrate each "specific and articulable fact" which led up to the rational detention and the justifiable arrest of all three suspects.

In reality, not all criminal incidents that occur on our public streets or in our airports unfold in the precise factual manner described in case law. When they do not, law enforcement officials have to adapt to the situation. Here, the facts firmly reveal that we are dealing with a seasoned federal agent who was applying his vast experience to proper use, relying not on mere hunches but on stated objective factors. In cases such as this, the officers' efforts should be supported and legally sustained.

APPENDIX A

PEOPLE'S EXHIBIT NO. 1

APPENDIX A1

*Day 1 Time*

| 9-5 | 5-13 | 10-2 | |
|---|---|---|---|
| 900⁰⁰ | 700⁰⁰ | 500⁰⁰ | 2,100⁵⁰ |
| | | | ×5 |
| Cash | Cash | Cash | 10,500⁰⁰ |

*Day 2*

*Expences*
1.
2.
3.
4.
5.
6.
7

PEOPLE'S EXHIBIT NO. 1(a)

APPENDIX A2

PEOPLE'S EXHIBIT NO. 1(b)

APPENDIX B

PEOPLE'S EXHIBIT NO. 2

## APPENDIX C

### DEFENDANT PROFIT

PEOPLE'S EXHIBIT NO. 3

PEOPLE'S EXHIBIT NO. 11

# Appendix D

## Defendant Manuel

People's Exhibit No. 4

People's Exhibit No. 5

People's Exhibit No. 6

## APPENDIX E

## DEFENDANT DAWKINS

PEOPLE'S EXHIBIT NO. 7

PEOPLE'S EXHIBIT NO. 8

PEOPLE'S EXHIBIT NO. 9

PEOPLE'S EXHIBIT NO. 10